WOMENS SERVICES, P. C., a Nebraska Corporation, and G. William Orr, M. D., Plaintiffs,

v.

Charles THONE, Governor of the State of Nebraska; Paul L. Douglas, Attorney General for the State of Nebraska; and Donald L. Knowles, County Attorney for the County of Douglas, State of Nebraska, Defendants.

WOMENS SERVICES, P. C., a Nebraska Professional Corporation, and G. William Orr, M. D., Plaintiffs,

v.

Charles THONE, Governor of the State of Nebraska; Paul L. Douglas, Attorney General for the State of Nebraska; and Donald L. Knowles, County Attorney for the County of Douglas, State of Nebraska, Defendants,

Marilyn A. Schneider, Intervenor-Defendant.

LADIES CENTER, NEBRASKA, INC., a corporation; M. John Epp, M. D.; and Betty Roe, by her next friend, Barbara Gaither, Plaintiffs,

Elizabeth F., Intervenor-Plaintiff,

v.

Charles THONE, Governor of the State of Nebraska; Paul L. Douglas, Attorney General for the State of Nebraska; and Donald L. Knowles, County Attorney for the County of Douglas, State of Nebraska, Defendants,

Marilyn A. Schneider, Intervenor-Defendant.

Nos. CV78–L–289, CV79–L–85 and CV79–L–100.

United States District Court, D. Nebraska.

Nov. 9, 1979.

Lawrence I. Batt, Omaha, Neb., for plaintiffs Womens Services, P. C. and G. William Orr, M. D.,

Michael T. Levy, Omaha, Neb., for plaintiffs Ladies Center, Nebraska, Inc. and M. John Epp, M. D.

Judith Levin, New York City, for plaintiff Betty Roe and plaintiff-intervenor Elizabeth F.

Jerold V. Fennell, Asst. Atty. Gen., Lincoln, Neb., for defendants Charles Thone and Paul L. Douglas.

Henry L. Wendt, Deputy Douglas County Atty., Omaha, Neb., for defendant Donald L. Knowles.

James E. Schneider, North Platte, Neb., for defendant-intervenor Marilyn A. Schneider.

## MEMORANDUM OF DECISION

URBOM, Chief Judge.

On April 20, 1979, this court preliminarily enjoined several portions[1] of the Nebraska abortion law, Legislative Bill 316.[2] This

---

1. Enjoined were §§ 28–326(8), 28–327, 28–333, 28–334, and, insofar as it requires the reporting of "prescribed" abortions, 28–343.

2. The predecessor of L.B. 316, L.B. 38, contained sections marked 28–325 to 28–345. At a hearing on December 28, 1978, I preliminarily enjoined §§ 28–327 to 28–334, inclusive, 28– 336, and 28–343 to 28–345, inclusive. The legislature responded by passing L.B. 316, which repealed many of the sections of L.B. 38 and enacted new sections in their place. Those

opinion follows a full hearing on the merits; it speaks to the standing and religious freedom issues before addressing the specific sections in question.[3]

## I.
### STANDING OF LADIES CENTER, INC. AND BETTY ROE

██ The standing doctrine, as it limits the jurisdiction of federal courts, consists of "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The constitutional aspect, which presents the threshold and only standing question in this case,[4] stems from Article III of the Constitution of the United States, which restricts judicial power to "cases" and "controversies." This aspect of standing focuses on:

". . . whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf. *Baker v. Carr,* 369 U.S. 186, 204 [82 S.Ct. 691, 703, 7 L.Ed.2d 663] (1962). . . . A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action . . . .' *Linda R. S. v.*

*Richard D.,* 410 U.S. 614, 617 [93 S.Ct. 1146, 1148, 35 L.Ed.2d 536] (1973). . . ."
*Warth v. Seldin,* 422 U.S. at 498–499, 95 S.Ct. at 2205.

### A.

██ The plaintiff Ladies Center, Inc. is a Florida corporation authorized to do business in Nebraska. It provides facilities and support staff to physicians who perform abortions and other gynecological services on its premises. While Ladies Center does not employ the physician, who is an independent contractor, it does employ the members of the support staff. The "informed consent" currently obtained from patients, as well as other steps in the preparation of the patient for an abortion, is routinely carried out by Ladies Center employees.

By the order of April 20, 1979, the court certified a class of plaintiffs, consisting of all organizations which offer and provide facilities and a support staff to physicians who perform abortions. Ladies Center, the moving party, was designated class representative.

██ That Ladies Center satisfies the Article III dimension of standing is beyond serious dispute. It has a direct interest in how the court resolves the challenged statutory sections. As the physician who performs abortions faces potential criminal liability for failing to comply with the disput-

---

sections substituted were 28–326, 28–327, 28–329, 28–330, 28–331, 28–333, 28–334, 28–342, 28–343, and 28–345. Several of the sections of L.B. 38 thus remain intact.

CV78–L–289 challenged provisions of L.B. 38. Two actions, CV79–L–85 and CV79–L–100, were brought after the passage of L.B. 316 and challenged the remaining sections of L.B. 38, except § 28–335, and the sections of L.B. 316.

3. The scope of the three lawsuits in this case has been considerably narrowed since the entry of a preliminary injunction on the provisions of L.B. 316 listed in footnote 1. By an order dated July 6, 1979, the three lawsuits were consolidated and the repealed sections of L.B. 38 were removed from consideration. By an order dated August 1, 1979, the plaintiffs were granted partial summary judgment with respect to the parental consultation requirements only of

§ 28–333, and with respect to § 28–336. The order dated August 1, 1979, also granted the plaintiffs' motion for leave to amend, and the plaintiffs deleted their challenges to the constitutionality of §§ 28–329 to 28–332, inclusive.

4. The other aspect of standing concerns itself with "judicial self-governance," whereby courts should avoid deciding "abstract questions of wide public significance" when other governmental institutions are more competent to address the questions and when judicial intervention is unnecessary to protect individual rights. *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). This aspect functions to screen out litigants who, for example, have only a "generalized grievance" or who inappropriately seek to assert the interests of third parties. *Id.,* at 499, 95 S.Ct. 2197.

ed sections, Ladies Center faces potential criminal liability as a person[5] who aids, abets, or causes another to commit a crime. This potential criminal liability is of the same magnitude as that of the physician. § 28–206, R.R.S.Neb. (Cum.Supp.1978). The physician, against whom the criminal statutes are aimed, clearly has standing. *Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). Accomplice liability creates a similar "direct threat of personal detriment," see *id.,* and therefore gives rise to standing. *Baird v. Bellotti,* 393 F.Supp. 847, 851 (U.S.D.C.Mass.1975), vacated and remanded on other grounds, *sub nom. Bellotti v. Baird,* 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976).

Because there is potential criminal liability, Ladies Center does not have standing problems of a nonconstitutional nature.[6] Its personal involvement is direct, specific, and concrete.

### B.

At the time of the filing of her complaint Betty Roe alleged that she was pregnant and desired an abortion. Testimony at the trial indicates that although she was pregnant at the time of passage of Legislative Bill 316, March 22, 1979, she procured an abortion before the date on which L.B. 316 became operative, April 21, 1979.

By the order of April 20, 1979, this court certified on the motion of Betty Roe a class of plaintiffs, consisting of all patients desiring abortions. In addition, by the order of September 14, 1979, the court granted intervention on behalf of Elizabeth F. and certified again the class of pregnant women seeking an abortion in Nebraska.

The defendants contend that, because Betty Roe was not pregnant at the time the challenged legislation became operative, she could allege no more than speculative injury due to that legislation. Her status, they argue, cannot be distinguished from that of the Does in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The Supreme Court in *Roe v. Wade* denied standing to a married, childless couple, John and Mary Doe. Although Mrs. Doe had been advised by her doctor to avoid pregnancy, she was not pregnant at the time of the filing of her pleading. Their injury due to the Texas abortion statutes, thus, was too speculative to engender standing. The court said:

" . . . Their alleged injury rests on possible future contraceptive failure, possible future pregnancy, possible future unpreparedness for parenthood, and possible future impairment of health. Any one or more of these several possibilities may not take place . . . But we are not prepared to say that the bare allegation of so indirect an injury is sufficient to present an actual case or controversy. . . ."

*Id.,* at 128, 93 S.Ct. at 714

The plaintiff Betty Roe argues that L.B. 316 became "effective" when Governor Thone signed it into law on March 22, 1979; thus, because she was pregnant at the time she filed her complaint, April 3, 1979, she was then faced with a threat of harm from the legislation. She contends that the emergency clause, § 15, caused the act to operate immediately after its passage. The plaintiff Roe also argues that if a pregnant woman does not have standing because an abortion law is not presently operating, then it is possible that she may never have

---

5. Section 28–109(16), R.R.S.Neb. (Cum.Supp. 1978), states that a "person," when relevant, shall mean a corporation.

6. Another ground for standing is conceivable. Ladies Center, Nebraska, Inc. is, in part, the subject of regulation by the challenged legislation which may work to deprive third parties— women seeking abortions and doctors seeking to provide abortions—of their constitutional rights. Other plaintiffs, somewhat similarly situated to Ladies Center, have been granted

standing "as advocates of the rights of third parties who seek access to their market or function." *Craig v. Boren,* 429 U.S. 190, 192– 197, 97 S.Ct. 451, 454–456, 50 L.Ed.2d 397 (1976); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972).

Because the ground of potential criminal liability is sufficient to bring standing to Ladies Center, it need not rely on cases involving *jus tertii* standing.

standing to challenge that law, because it may be enjoined before it becomes operative.

Section 15 of L.B. 316 provides:

"Since an emergency exists, this act shall be in full force and take effect, from and after its passage and approval, according to law."

Section 12 of that bill states that the "act shall become operative thirty days after its effective date."

While the act may be deemed, as a matter of semantics, "effective" after its passage due to the terminology of § 15, the dictates of the act do not impinge upon anyone until the statute becomes operative. A plain reading of § 12 and the bill as a whole clearly indicates that the act was not to operate until thirty days had passed after its approval.

Betty Roe contends that the thirty-day hiatus before operation of the statute was to permit the institution of lawsuits challenging the law. Although this may have been so, there is nothing in the language of the act or in its legislative history to indicate that the legislature intended to create standing on behalf of those who would not otherwise have standing. Certain persons—for example, physicians desiring to perform abortions—already unquestionably possessed standing to challenge the act. The inference, then, if the legislature intended to permit legal action during the thirty-day period, is that it intended to allow those with standing to challenge the act. Nothing would lead one to believe that the legislature intended to create a personal interest in that action on behalf of women who would not be pregnant at the time of the act's operative date.

■ To obtain standing the plaintiff must allege a personal stake in the outcome of the controversy sufficient to warrant exercise of the court's remedial powers on her behalf. *Warth v. Seldin,* 422 U.S. at 498, 95 S.Ct. 2197. The time at which the plaintiff must possess that personal interest is at the filing of the complaint. Once the plaintiff has standing, the question of the effect of a change in circumstances goes to mootness.

■ The crucial date at which the provisions of the act create a personal stake on behalf of its proposed subjects is the date the act becomes operative, not the date of its passage. Only when the act operates —i. e., has the capacity to be enforced— does it intrude upon the decisionmaking process of those affected by it. For one to have a personal stake in a challenge to an act, one must be currently affected, in the position of being imminently affected, or, certain to be affected in the future by the act; otherwise, the act simply does not bear on that individual.

■ Because Betty Roe was not affected or in threat of being affected by L.B. 316 at the time she filed her lawsuit, she did not have standing. Although she was pregnant, there was no way the abortion law could interfere with her plans to terminate that pregnancy. She suffered neither injury nor threat of injury due to the challenged law. At the time she filed her complaint this was apparent.[7]

■ The situation in the present case is different from other cases where the pregnant woman has been granted standing. For example, in *Roe v. Wade,* supra, the abortion law was in effect at the time the pregnant woman challenged it; in *Baird v. Bellotti,* supra, at 850–851 and n. 6, the pregnant woman brought suit shortly before the effective date of the statute. The *Baird* court noted that "the statute . . . would prevent her . . . from obtaining an abortion without compliance with its terms." 393 F.Supp. at 851. Standing was created by the fact that the statute's imminent operation would have burdened her exercise of her rights. The issuance of an injunction did not nullify that standing; if

7. At the time Betty Roe filed her complaint there remained three weeks before L.B. 316 was scheduled to become operative. She desired an abortion at the time she filed her complaint. The court received no evidence which would indicate that three weeks is an insufficient time in which to procure an abortion under the then-existing laws of Nebraska.

anything, that action would go to mootness.[8] The case at bar differs significantly from *Baird.*

## II.

### RELIGIOUS FREEDOM

The First Amendment to the Constitution of the United States forbids the state [9] to make any law "respecting an establishment of religion, or prohibiting the free exercise thereof." The plaintiffs contend that the legislation in question violates both the Establishment Clause and the Free Exercise Clause.

### A.

■ Legislation challenged under the Establishment Clause may survive constitutional scrutiny only where it satisfies a three-part test. It:

". . . first, must reflect a clearly secular legislative purpose, . . . second, must have a primary effect that neither advances nor inhibits religion, . . . and, third, must avoid excessive government entanglement with religion . . ."

*Committee for Public Education v. Nyquist,* 413 U.S. 756, 773, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973).

The plaintiffs attack the current Nebraska abortion legislation on each part of the test.

1. *Purpose*

The plaintiffs assert that the legislation under examination has no clearly secular purpose. They maintain that at the heart of the legislation is the belief that life begins at conception. Because this belief is a religious belief, the plaintiffs argue, this legislation fails to embody a clearly secular purpose.

The following elements must be established before the court can adopt the plaintiffs' position: a. that the idea that life begins at conception was a motivating principle of the legislation; b. that the conviction that life begins at conception can be a "religious" belief for purposes of the Establishment Clause and was a motivating principle for this legislation in its capacity as a "religious" belief; and c. that there is no purpose for this legislation, the protection of fetal life aside, which amounts to a clearly secular purpose.

*a.*

The first element has clearly been established. At trial the defendants through their counsel affirmed the following statement, taken from page 3 of their brief dated April 6, 1979:

"Defendants admit without qualification that the statutes in question were enacted and will be enforced in the interest of unborn children from the moment of conception. We do so based on the strong and legitimate right of the state's interest in the fetus. *Maher v. Roe,* 432 U.S. 464, 478[, 97 S.Ct. 2376, 53 L.Ed.2d 484] n. 11 (1977)."

Moreover, the legislature openly proclaims its intent to protect fetal life. The intact declaration of purpose for L.B. 38, the predecessor of L.B. 316, reads as follows:

"28–325. Abortion; declaration of purpose. The Legislature hereby finds and declares:

---

**8.** For purposes of mootness, pregnancy is treated differently from some other conditions. The same considerations supporting that different treatment, however, do not apply with respect to standing. The time-consuming aspects of trial and the appellate process affect the feasibility of maintaining a live controversy throughout the process. See, e. g., *Doe v. Poelker,* 497 F.2d 1063, 1067 (C.A. 8th Cir. 1974). The time-consuming dimension of the judicial process does not affect the establishment of standing at the moment of the filing of the complaint; standing must exist at that one point. Afterward, considerations of mootness, with its special allowance for pregnancy, control.

**9.** The First Amendment specifically enjoins action by Congress. Through the Due Process Clause of the Fourteenth Amendment, the First Amendment has been applied to the states. See, e. g., *Everson v. Board of Education,* 330 U.S. 1, 8, 67 S.Ct. 504, 91 L.Ed. 711 (1947); *Pierce v. Society of Sisters,* 268 U.S. 510, 535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

(1) That the following provisions were motivated by the legislative intrusion of the United States Supreme Court by virtue of its decision removing the protection afforded the unborn. Sections 28–325 to 28–345 are in no way to be construed as legislatively encouraging abortions at any stage of unborn human development, but is rather an expression of the will of the people of the State of Nebraska and the members of the Legislature to provide protection for the life of the unborn child whenever possible;"

*b.*

The second element presents a difficult conceptual issue. It must be determined whether the tenet that life begins at conception constitutes a religious belief within the context of the Establishment Clause. The issue is one which cannot be taken lightly, because, on the one hand, it has the potential to involve deeply meaningful personal rights, and on the other hand, its determination could remove vast areas of human conduct from the legislative domain.

This segment of the opinion first discusses general considerations touching the definition of religious belief. It then addresses the bearing of testimony on the issue. Next, it considers several of the plaintiffs' proffered positions. Finally, it evaluates the life-at-conception principle within the parameters of religious belief, both theistic and nontheistic, established in the first subsection.

*i.*

Delimiting the expanse of religious belief for First Amendment purposes—either Free Exercise or Establishment—[10] may not be done by resort to a solitary standard.

Neither the Constitution nor the Supreme Court has defined religion in this context, and Supreme Court decisions have trod a tortuous path. E. g., *Walz v. Tax Commission,* 397 U.S. 664, 668, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). Modern decisions do indicate, however, that the Religion Clauses contemplate both theistic and nontheistic religious beliefs. See *Torcaso v. Watkins,* 367 U.S. 488, 495, 81 S.Ct. 1680, 6 L.Ed.2d 982 and n. 11 (1961); see, generally, *Wisconsin v. Yoder,* 406 U.S. 205, 215, 92 S.Ct. 1526, 32 L.Ed.2d 15 and n. 6 (1972), citing *Welsh v. United States,* 398 U.S. 333, 357, n. 8, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970) (Harlan, J., concurring); *McGowan v. Maryland,* 366 U.S. 420, 465–466, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961) (Frankfurter, J., concurring). It is instructive to consider these two poles of religious belief individually.

The traditionally dominant constitutional view of religious belief has dealt with man's relationship to a Supreme Being. This was the posture of the Framers. See, e. g., Jefferson, "An Act for Establishing Religious Freedom" and "Notes on Virginia;" Madison, "A Memorial and Remonstrance on the Religious Rights of Man," in *Cornerstones of Religious Freedom in America,* (J. Blau, 1949). It was also the theme in Supreme Court decisions until relatively recent times. E. g., see *Davis v. Beason,* 133 U.S. 333, 342, 10 S.Ct. 299, 33 L.Ed. 637 (1890) (religion encompasses one's relationships with his Creator and the concomitant obligations of reverence and obedience to His will); *United States v. Macintosh,* 283 U.S. 605, 633–634, 51 S.Ct. 570, 75 L.Ed. 1302 (1931) (Hughes, C. J., dissenting), overruled, *Girouard v. United States,* 328 U.S. 61, 66 S.Ct. 826, 90 L.Ed. 1084 (1946).

---

**10.** Although some commentators feel that the definition of religion must differ as between its use in the Establishment Clause and its use in the Free Exercise Clause, see, e. g., § 14–6, *American Constitutional Law,* (L. Tribe, 1978), this sentiment is not convincing. See *Everson v. Board of Education,* 330 U.S. 1, 32–33, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (Rutledge, J., dissenting); *Malnak v. Yogi,* 440 F.Supp. 1284, 1316, n. 20 (U.S.D.C. N.J.1977); Merel, "The Protection of Individual Choice: A Consistent Understanding of Religion Under the First

Amendment," 45 U.Chi.L.Rev. 805, 829, n. 128, and accompanying text (1978).

As Justice Rutledge notes in *Everson v. Board of Education,* the Constitution employs the word "religion" only once for both clauses. Both the principle of statutory construction and the absence of any Framers' intent to the contrary point toward a single definition of religion in the First Amendment. Discussion regarding the definition of religion proceeds from this basis.

Most major modern decisions, moreover, have dealt with theistic religious beliefs. See, e. g., *Constitutional Law,* Ch. 14 (G. Gunther, 9th ed. 1975). Because the presence of religious activity was not an issue in those cases, none of them effectively offers more than a factual situation to indicate one set of coordinates in the religious plane. That religious plane includes, for example, recitation of a prayer to a Supreme Being, *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 86 L.Ed.2d 601 (1962); the reading of Bible verses, *Abington School District v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); affirmation of belief in a Supreme Being, *Torcaso v. Watkins,* supra; and the teaching of divine creation, *Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). From these examples, it may be extracted that a theistic religious belief for First Amendment purposes is one that is attributable to or based upon the will of God. See *Davis v. Beason,* 133 U.S. at 342, 10 S.Ct. 299.

Before discussing nontheistic religious belief, I note that the plaintiffs' evidence regarding religious freedom consisted primarily of testimony of experts in the field of theistic religious beliefs. Their Establishment argument pivots largely on the position of the Roman Catholic Church regarding the life-at-conception principle, and, to a lesser extent, the positions of other churches which are based on a belief in God and obedience to His will. Their Establishment argument thus is made on the assertion that the motivating purpose for this legislation was a *theistic* religious belief. Both theistic and nontheistic religious belief bases, however, should be explored.

The Supreme Court has done little to map out the terrain of nontheistic religious belief. In its one major excursion to date, *Torcaso v. Watkins,* supra, the court struck down a provision of the Maryland Constitution which required appointees to state offices to declare their belief in the existence of God as a condition of obtaining their commissions. This provision had operated to deny a Secular Humanist, who had refused to declare a belief in God, an appointment as a public notary. The court stated:

". . . [N]either a State nor the Federal Government can constitutionally force a person 'to profess a belief or disbelief in any religion.' Neither can constitutionally pass laws or impose requirements which aid all religions as against non-believers, and neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs."

367 U.S. at 495, 81 S.Ct. at 1683–1684. The court in a footnote in that case listed several nontheistic religions:

"Among religions in this country which do not teach what would generally be considered a belief in the existence of God are Buddhism, Taoism, Ethical Culture, Secular Humanism and others. . . ."

367 U.S. at 495, n. 11, 81 S.Ct. at 1684, n. 11.

A nontheistic belief which qualifies as religious in the First Amendment sense is one limited at least to a belief of an adherent to an organized, nontheistic group. Whatever else nontheistic religion is, it has at least two essential qualities: *tenets* and *organization.* Three reasons support the foregoing conclusion.

First, this is the boundary presently staked out by the court in *Torcaso.*

Second, the expansion of nontheistic religious belief to one of mere "personal conscience," rather than adherence to an organized group, would put the trial court in a position of evaluating a complainant's constitutional rights based on its impression of his sincerity or credibility. This obviously presents a great possibility of dissimilar treatment of similarly situated complainants. Furthermore, it might devolve to the elitist end of protecting the constitutional rights of the articulate more than those of the inarticulate. Carried to its logical conclusion, such a standard would either be meaningless or result in artificial and arbitrary distinctions.

Third, an expansion of nontheistic religious belief beyond the above-articulated

standard would go beyond the path charted by the Supreme Court in *Wisconsin v. Yoder*, supra:

" . . . [T]o have the protection of the Religion Clauses, the claims must be rooted in religious belief. Although a determination of what is a 'religious' belief or practice entitled to constitutional protection may present a most delicate question, the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests. Thus, if the Amish asserted their claims because of their subjective evaluation and rejection of the contemporary secular values accepted by the majority, much as Thoreau rejected the social values of his time and isolated himself at Walden Pond, their claims would not rest on a religious basis. *Thoreau's choice was philosophical and personal rather than religious, and such belief does not rise to the demands of the Religion Clauses.*" (Emphasis added)

406 U.S. at 215–216, 92 S.Ct. at 1533 A standard less than that articulated above would degenerate into a question of personal preference, even if it were deeply felt. This *Yoder* clearly speaks against.

From the foregoing discussion of nontheistic religious belief as related to the First Amendment, it follows that the Supreme Court's broad reading of religious belief when interpreting modern congressional draft laws found in *United States v. Seeger*, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965), and *Welsh v. United States*, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970), does not apply to its reading of religious belief in the context of the First Amendment. See, also, *Malnak v. Yogi*, 440 F.Supp. 1284, 1314 (U.S.D.C.N.J. 1977) (discussing why the majority opinions in *Seeger* and *Welsh* are not significant with respect to the definition of religious belief for purposes of the First Amendment Clauses). The Supreme Court has studiously framed the conscientious objector issue narrowly as one of statutory, rather than constitutional, construction. *E. g., United States v. Seeger*, 380 U.S. at 174, 90 S.Ct. 1792.

*ii.*

■ The court received conflicting testimony during trial about the idea that life begins at conception is a religious idea. This specific question, however, is not one to be resolved on the basis of burden of proof or credibility of witnesses; it is a question of law for the court to decide. *Malnak v. Yogi*, 440 F.Supp. at 1303–1304. Otherwise, the concept of a religious belief could fluctuate from case to case, and similar or identical beliefs could be either religious or not religious, depending solely on differences of testimony elicited and perceptions of the trier of fact. See *id.*, at 1318.

■ Moreover, other implications of allowing religious leaders to determine which beliefs are "religious" cut against the grain of the First Amendment. Differing religious denominations take different positions on the subject with different references to and different interpretations of scriptures. The mere fact that religious groups disagree or quote the Bible to support public positions or take political action to further their positions, however, will not transform a controversy into a dispute among "religious" beliefs of the type of which the Establishment Clause curtails resolution in the political arena. If this were not the case, state regulations concerning areas such as intoxicating beverages, homosexuality, obscenity, and even marriage and divorce, would be beyond state regulation. As the Supreme Court through Mr. Chief Justice Burger said:

"Adherents of particular faiths and individual churches frequently take strong positions on public issues including, as this case reveals in the several briefs *amici*, vigorous advocacy of legal or constitutional positions. Of course, churches as much as secular bodies and private citizens have that right. No perfect or absolute separation is really possible; the very existence of the Religion Clauses is an involvement of sorts—one that seeks to mark boundaries to avoid excessive entanglement."

*Walz v. Tax Commission*, 397 U.S. 664, 670, 90 S.Ct. 1409, 1412, 25 L.Ed.2d 697 (1970).

The testimony concerning the scope of "religious" belief has value, but only to provide a background for determination of the legal issue.

*iii.*

 The plaintiffs suggest that, where societal rules are based upon principles which coincide with dictates of faith, these rules may be considered secular, if they are "accepted by overwhelming social consensus and serve predominately secular ends." See Plaintiffs' Mid-Trial Brief, p. 44. Such a standard, however, would be circular as well as inappropriate for consideration of purpose, because it focuses more on effect than purpose. Furthermore, the rationale of such a standard is not supported by prior decisions. The plaintiffs also hint at a standard [11] which contemplates the individual's "rights of conscience," *id.*, but this, too, is not appropriate. See *Wisconsin v. Yoder,* 406 U.S. 205, 215–216, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).[12]

Another line of argument employed by the plaintiffs amounts to the following: There is a difference of opinion over when life begins. Science cannot tell us when life begins. Some theologians say that this issue is a "religious" one. Therefore, the belief that life begins at conception is a religious belief.

 This argument is not persuasive. It is supported neither by case law nor by reason. Merely because science cannot answer a question does not mean that that question is thrown into the realm of religion for purposes of the Establishment Clause, and this holds true even if theologians label the question religious. There are many questions that science cannot answer, because the scientific method neither makes value judgments nor provides underlying definitions to which scientific evidence may be directed. Thus, scientists working within different definitional frameworks may come to different conclusions, when they apply their scientific expertise. Until a particular definition of what constitutes human life has been adopted, the scientist has no framework within which to determine when human life begins. The plaintiffs argue that the definitional question is by necessity one of a religious nature,[13] but this is not so. Not all or even most value judgments or definitions must be considered religious matters, but may be, in the words of Mr. Chief Justice Burger in the *Yoder* case, "philosophical and personal."

The judgment as to what precise set of factors amounts to human life is a matter of individual judgment. For some persons it springs from a belief in a Supreme Being; for others, perhaps, from a tenet of a nontheistic religion; and for still others, from philosophical considerations unrelated to a Supreme Being or a tenet of a nontheistic religion. One's judgment on the matter could arise from a combination of these determinants.

 So long as a legislature bases its determination as to what factors comprise human life on considerations which are as capable of being labeled philosophical as religious, the Constitution does not require that the chosen set of factors be called religious or that a different set of factors be chosen.

11. The plaintiffs would derive this standard from the concurring opinion of Mr. Justice Brennan in *Abington School District v. Schempp*, 374 U.S. 203, 231, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).

12. The word religion imports the same meaning for both clauses in the First Amendment. See footnote 10 above. Discussion in the *Yoder* case, a Free Exercise case, regarding the definition of religion or religious belief is therefore applicable to this discussion involving the Establishment Clause.

13. The plaintiffs suggest that the traditional criteria used to determine whether a belief is "religious" is where it is (1) the official belief of a religious institution, and (2) not shared by society as a whole. Post-Trial Brief of Betty Roe, p. 13. To show that this standard is unrealistically broad does not require much attention. Areas such as marriage, divorce, and consumption of alcoholic beverages are examples of areas which would be covered by such a definition. Clearly, the Establishment Clause is not meant to reach that far.

*iv.*

For purposes of this case, it will not be necessary to define religious belief further or distinguish it further from philosophical conclusion and the scientific method. The assertion of the Nebraska legislature that life begins at conception may have come from impulses of a philosophical or religious nature or one of the other mixed with scientific data.[14] The evidence before the court does not establish that religious considerations—theistic or nontheistic— were a significant motivating force in the passage of the legislation.[15]

The face of the legislation does not suggest a purpose of carrying out either obligations to or the will of a Supreme Being. It does not declare a purpose of adhering to a tenet of a nontheistic religion. Neither does the legislative history. In fact, the contents of the record are consistent with the philosophical side of the life-at-conception principle. Thus analyzed, the legislation reflects a clearly secular purpose within the meaning of the *Nyquist* case, supra.

The legislative record does reveal numerous references to the Catholic Church, one characterization of the subject by a senator as a "church issue," and the characterization by the bill's chief sponsor

as embracing the "pro-life philosophy." Nevertheless, the record does not, to the court's knowledge, contain statements by the bill's chief sponsor or any supporting legislator which affirm or assign significance to a belief that this legislation should be passed to bring the law into closer conformity with the will or design of God or a nontheistic religious principle. The First Amendment does not invalidate legislation because church groups lobbied for it, thereby creating a "church issue." See *Walz v. Tax Commission*, 397 U.S. at 670, 90 S.Ct. 1409.

*c.*

While the third element to the plaintiffs' position need not be addressed, it should be considered, because such a consideration will show an unquestionably secular purpose for the legislation.

The obvious secular purpose at issue here is that of maternal health. That the legislature was concerned with maternal health is apparent. Subsections 4 and 5 of the intact declaration of purpose for L.B. 38, the predecessor of L.B. 316, say:

"(4) That currently this state is prevented from providing adequate legal remedies to protect the life, health, and wel-

14. One scientist testified that at conception an embryo has its own individual genetic code to direct its existence and development, that a fetus is anatomically, physiologically, and in its destiny separate from its mother, and that the fetus depends upon its mother only for nourishment and oxygen.

A different scientist, on the other hand, testified that life is a continuum, that both the sperm and the ovum are genetically distinct from its producers [albeit, each only contains half a genetic code necessary to direct human development], and that there is no scientific reason to assign special significance to the moment of conception.

One expert testified that from a religious viewpoint some persons consider the beginning of life to be at conception because the embryo then is calling for a soul and the soul is soon after embodied.

Another expert in religion considered the choosing of some particular moment in the process of creating life to be a value judgment and suggested that value judgments are the prerogative of religion.

There is no constitutional reason to compel a state legislature not to pick the evidence provided by the first scientist as a basis for its decision about the beginning of life. That decision would rest on a philosophical definition of life and scientific evidence to establish what is the likely result of the physical attainment of a set of factors matching that philosophical definition.

15. A precise standard of review need not be delineated. It is enough to note a threshold beneath which motivation by a concept as a religious belief could not possibly corrupt a piece of legislation. Such a threshold would be where the concept in its capacity as a religious belief comprises a significant factor in the legislative purpose.

One recent district court decision asserts that legislation passes the purpose test unless it is motivated by a belief that is clearly and singularly religious. *Akron Center for Reproductive Health v. City of Akron*, No. C78–155A (unreported opinion U.S.D.C. N.D. Ohio, August 22, 1979, pp. 22–23). I do not adopt this test, however.

fare of pregnant women and unborn human life; and

"(5) That it is in the interest of the people of the State of Nebraska to maintain accurate statistical data to aid in providing proper maternal health regulations and education."

Furthermore, the legislative history and a reading of the legislation itself lead to the conclusion that one concern, even though not the dominant one, was that of the pregnant woman's physical and mental well being.

■ The plaintiffs argue that the legislature's expressed concern for maternal health is not genuine. They maintain that a legislative act genuinely concerned with maternal health would impose no restrictions on a woman's access to an abortion. These arguments are not persuasive. It is not out of the range of reason for one to think that some regulations on abortion would promote either the mental or physical health of the pregnant woman. The regulations may be unconstitutional, but not because the legislature was irrational or insincere. Also, matters such as "true" legislative intent are too speculative on the facts of this case to compel the disregarding of an apparent legislative purpose. See, also, *Akron Center for Reproductive Health v. City of Akron*, No. C78–155A (unreported opinion U.S.D.C. N.D. Ohio, August 22, 1979, pp. 24–35).

One point should be made about the purpose test in general. The plaintiffs have made extensive arguments along this line and have relied on many cases which do not directly confront problems inherent in putting legislative purpose in this context under the microscope. The Supreme Court has understandably decided the vast majority of its Establishment Clause cases under either the effect test or the entanglement test. Some commentators have asserted that "the primary goal of the Establishment Clause is to protect freedom of choice—to bar the government from doing that which has the potential for inducing religious belief." Note, "Transcendental Meditation and the Meaning of Religion

Under the Establishment Clause," 62 Minn. L.Rev. 887, 896 (1978). The primary focus, then, normally would be the effect rather than the purpose of legislation.

### 2. Effect

■ A law violates the Establishment Clause if its "primary effect" either advances or inhibits religion. The plaintiffs assert that this test is met where it is shown that a law's religious effect is more than remote, indirect, or incidental. This is inaccurate. Although the Supreme Court has characterized the effect of a permissible law as "remote and incidental" in its advantage to religious institutions, it has characterized the effect of an impermissible law as "direct and immediate" with respect to advancing religion. *Committee for Public Education v. Nyquist*, 413 U.S. at 783, 93 S.Ct. 2955, n. 39; see, e. g., *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975). This case does not require either an articulation of a precise standard or a characterization of this law's effect as either "direct and immediate" or somewhere in the middle. The challenged legislation here clearly has no more than a "remote and incidental" effect, if any at all, of advancing or inhibiting religion.

That the law would neither advance nor inhibit religion in more than a remote and incidental way follows from the above discussion of religion as differentiated from science and philosophy. The law regulates a woman's access to abortion, specifically in its dominant provisions, by requiring that she receive certain information and wait forty-eight hours from the time she receives that information before she may obtain an abortion. Here, neither the information nor the delay—the essence of the law—conveys any message to the woman that is necessarily religious in its nature. Moreover, if a woman somehow receives the impression that this is a requirement on behalf of the state to do what it can to preserve fetal life, then it still may be said that this is not a religious message. There still has been no communication regarding God's will or any reason for the woman to

think that the state seeks to implement God's design, the tenet of any religion respecting God's design, or the tenet of any nontheistic religion. For all she knows, the state acts from a philosophical or scientific viewpoint. See *Malnak v. Yogi,* 440 F.Supp. at 1316–1317, n. 20 (principles which happen to coincide with "the dogmas of many religious sects" are not necessarily religious; they become religious, however, if "taught as . . . divine law.").

 As stated earlier, the Establishment Clause "should bar the government from doing that which has the potential for inducing religious belief." Note, 62 Minn.L. Rev. at 896. It would stretch the imagination to see how the requirements of this legislation could either induce or inhibit a certain religious belief or religion in general. This case bears no resemblance, for example, to *School District of Abington Township v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), where state law and practice required Bible reading sessions in the public schools. The state here does not endorse, either explicitly or implicitly, one "religious" viewpoint or religion in general, and the legislation would not have the tendency of causing someone to avoid, adopt, or abandon "religious" beliefs.

### 3. *Entanglement*

". . . [F]or the men who wrote the Religion Clauses of the First Amendment the 'establishment' of a religion connoted sponsorship, financial support, and active involvement of the sovereign in religious activity. . . ." *Walz v. Tax Commission,* 397 U.S. at 668, 90 S.Ct. at 1411. The Supreme Court has set out factors germane to the analysis of sponsorship, support, and involvement:

"In order to determine whether the government entanglement with religion is excessive, we must examine the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority. . . ."

*Lemon v. Kurtzman,* 403 U.S. 602, 615, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971)

Legislation which requires "official and continuing surveillance" of a religious institution suggests an "impermissible degree of entanglement." *Walz v. Tax Commission,* 397 U.S. at 675, 90 S.Ct. at 1414.

 The legislation in this case shows no sign of entanglement problems. There is no government sponsorship or financial support of religious activity. The government is not actively involved in religious activity. The government has neither aided religious institutions nor engendered a need for surveillance of those institutions.

 The plaintiffs' main argument with respect to the entanglement test is that when a state takes a position on abortion it invites political struggles based along lines of religion. The potential for political divisiveness is indeed a relevant factor in some circumstances for entanglement considerations. *Lemon v. Kurtzman,* 403 U.S. at 622, 91 S.Ct. 2105. But it is only a factor, as in the *Lemon* case, where the political divisiveness is sparked and continually fueled by the government regulation and periodic review of religious institutions. In the case at bar the political divisiveness arises not from a desire to influence annual state appropriations which benefit certain religious institutions, as in *Lemon,* but from a desire with an origin independent of state regulation. Political divisiveness along lines of religion alone would not be sufficient to remove an area from the legislative domain on the grounds of the Establishment Clause. Otherwise, many areas, such as divorce, would be removed from the legislative domain which have been in it since before our nation's birth.

### B.

 The state may not interfere with the practice of a legitimate religious belief unless it is necessary to do so in order to serve an interest "of the highest order." *Wisconsin v. Yoder,* 406 U.S. at 214–215, 92 S.Ct. 1526; *Sherbert v. Verner,* 374 U.S. 398, 403–406, 83 S.Ct. 1790, 10 L.Ed.2d 965

(1963); *Braunfeld v. Brown,* 366 U.S. 599, 606–607, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961). To qualify for protection under the Free Exercise Clause, a belief and practice may not be "merely a matter of personal preference," but must be "one of deep religious conviction, shared by an organized group, and intimately related to daily living." *Wisconsin v. Yoder,* 406 U.S. at 216, 92 S.Ct. at 1533. In addition, the practice must "stem from" one's faith, and be "fundamental to" that faith. *Id.; Teterud v. Burns,* 522 F.2d 357, 360 (C.A. 8th Cir. 1975) (the practice must be "deeply rooted in religious belief"); *People v. Woody,* 61 Cal.2d 716, 720, 40 Cal.Rptr. 69, 73, 394 P.2d 813, 817 (1964) (protection provided where the practice played a "central role" in the practitioner's religion).

■ Examination of the legal standard clearly shows that the plaintiffs may not invoke the protection afforded by the Free Exercise Clause. The plaintiffs have presented no evidence to indicate that a woman's obtaining of an abortion without the regulation imposed by this legislation would constitution a fundamental tenet of any religion. Therefore, the challenged regulation could not interfere with the practice of a fundamental religious tenet.

The plaintiffs presented testimony by various religious leaders to the effect that a woman's decision to abort or to bear a child was a deeply personal and important decision, one that could be considered religious. One witness indicated that under some circumstances the decision to abort would be a moral necessity and agreed that it could be describe as a religious duty.

The testimony elicited defeats any free exercise claims. The fact that the decision is one to be made by the individual woman, and the fact that the decision—and thereby practice—will vary only on the ingredients of each woman's situation, indicate that the matter is one of "personal preference" rather than the practice of an organized reli-

gion. The fact that the abortion decision may be counseled by a clergyman does not change this aspect. Even accepting, for purposes of argument, that *abortion* could be considered for some a "religious duty," that does not make *abortion without state regulation* a religious duty. See, generally, *Braunfeld v. Brown,* supra. Furthermore, the fact that procuring an abortion may be a religious duty for some, but not for others, who are pregnant indicates that unfettered abortion does not constitute a religious "tenet," much less a "fundamental" tenet of any religion. In any event, as indicated earlier, the mere labeling of something as coming within a "religious" area by theologians does not serve to make that area "religious" for purposes of invoking First Amendment protections.

### III.

### FOURTEENTH AMENDMENT

From the filing of the complaints in these actions to the time of trial, the scope of the action has been considerably narrowed.[16] The remaining challenges to the abortion legislation, as crafted at the pretrial conference,[17] question aspects of the record-keeping, informed-consent, and waiting-period provisions. These provisions will be addressed seriatim, after a brief discussion of the applicable standards of review.

Before addressing the merits of the sections in question I note that the court received much evidence about the operation of abortion clinics and the health risks of abortion vis-a-vis those of childbirth. The defendants have presented much of this evidence to create an appellate record for the purpose of seeking to change the standard of review regarding abortion. In deciding the issues now before the court, however, I make only those few findings of fact necessary to determine the constitutional status of the challenged provisions under the present standard of review.

---

16. See footnote 3, supra.

17. Several sections have been challenged in the three actions which were not brought up at the

pretrial conference. As the challenge to these sections has apparently been abandoned, I rule the following sections constitutional: §§ 28–335, 28–325, 28–342, and 28–345.

### A.

The plaintiffs claim that all or part of the challenged provisions unduly burden a woman's right to terminate her pregnancy, are void for vagueness, and violate the Equal Protection Clause. It is sufficient to set out briefly the standards of review at this point and develop them later as necessary.

#### 1. *Procedural Due Process*

The standard governing consideration of a void-for-vagueness challenge was stated in *Colautti v. Franklin,* 439 U.S. 379, 390, 99 S.Ct. 675, 683, 58 L.Ed.2d 596 (1979), as follows:

". . . [A] criminal statute that 'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute,' . . . or is so indefinite that 'it encourages arbitrary and erratic arrests and convictions,' . . . is void for vagueness. . . ."

#### 2. *Equal Protection*

In raising the equal protection claims the plaintiffs· apparently seek to trigger strict scrutiny based on the following dicta of the Supreme Court of the United States in *San Antonio School District v. Rodriguez,* 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973):

". . . We must decide, first, whether the [state legislation] operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny. . . . If not, the [legislation] must still be examined to determine whether it rationally furthers some legitimate, articulated state purpose and therefore does not constitute an invidious discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment."

Strict scrutiny would nullify any legislative classification impinging on a fundamental right, if that classification were not narrowly drawn to further some compelling state interest. See, e. g., *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). The appropriate standard of review, however, is not that of strict scrutiny. The Supreme Court has addressed the *San Antonio School District v. Rodriguez* case in the abortion context and has indicated that the rational relationship test would apply where a regulation on abortion differed from regulations on other medical procedures in general. *Maher v. Roe,* 432 U.S. 464, 470–471, 473, 478, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977). Furthermore, the court has specifically applied the rational relationship test when adjudicating the constitutionality of a restriction placed on abortion but not placed on other surgery. *Doe v. Bolton,* 410 U.S. 179, 194, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); see, also, *Carey v. Population Services International,* 431 U.S. 678, 696, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (Brennan, J., delivering the judgment of the court on this aspect). Finally, the Supreme Court has made it clear that certain restrictions or regulations may be imposed on abortion (and not imposed on other types of surgery) without labeling the underlying state interests involved fundamental. E. g., *Planned Parenthood of Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) (record-keeping and reporting); *Bellotti v. Baird,* 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (requirement of a minor, under certain circumstances, to consult with or obtain consent from her parents). Moreover, the policy underlying the application of strict scrutiny under equal protection analysis to certain "fundamental" rights—to ensure effectively equal access to the criminal process, the political process, and education, see, e. g., "Developments," 82 Harv.L.Rev. 1065, 1192 (1969); *Constitutional Law,* 657–665, 689–874 (G. Gunther, 9th ed. 1975)—does not equally apply to legislative enactments regarding abortion. See, generally, *Kramer v. Union Free School District No. 15,* 395 U.S. 621, 627–628, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (the rational relationship test is based on the assumption that the political process functions effectively to represent

the public; strict scrutiny must be applied when the challenge is to this basic assumption underlying the presumptive validity of legislation). The Supreme Court has implied that this is the case. See, generally, *Maher v. Roe,* supra. The upshot is that a fundamental right for purposes of due process analysis is not necessarily a fundamental right for purposes of equal protection analysis. See *Maher v. Roe,* 432 U.S. at 471–478, 97 S.Ct. 2376. The applicable standard of review regarding classifications made between abortion and nonabortion surgery is whether the classifications in question are rationally related to a legitimate state interest.

■ One incidental point should be made at this juncture. Although the state's interest in the potential life of the fetus is not compelling prior to viability, it is legitimate. Compare *Roe v. Wade,* 410 U.S. at 154, 93 S.Ct. 705, with *Maher v. Roe,* 432 U.S. at 478, 97 S.Ct. 2376, n. 11.

3. *Substantive Due Process*

Turning to the due process standard which protects the pregnant woman's privacy rights, there need not be much said in addition to that stated in the April 20, 1979, memorandum granting a preliminary injunction, which was essentially as follows:

". . . The right of woman to choose without unduly burdensome interference whether to terminate her pregnancy is fundamental;

". . . The permissible degree of interference in that decision by the state depends upon the severity of the technique used by the state and the nature of the state's interest, which interest grows with the duration of the pregnancy;

". . . A state may not impose any direct obstacles—such as criminal penalties—to further its interest in the potential life of a fetus before viability; and

". . . A state has no compelling interest in the potential life of the fetus prior to the fetus' viability.

"Two additional cases need to be mentioned: *Planned Parenthood of Missouri v. Danforth,* 428 U.S. 52[, 96 S.Ct. 2831,

49 L.Ed.2d 788] (1976), and *Planned Parenthood Association v. Fitzpatrick,* 401 F.Supp. 554 (U.S.D.C. E.D. Pa. 1975), affirmed sub nom. *Franklin v. Fitzpatrick,* 428 U.S. 901[, 96 S.Ct. 3202, 49 L.Ed.2d 1205] (1976). In *Danforth,* the statute provided criminal sanctions for performing an abortion during the first twelve weeks of pregnancy without a certification by the woman that she consented to the procedure and 'that her consent is informed and freely given and is not the result of coercion.' That part of the statute was held constitutional. The rationale of the three-judge district court was that the provision ensures that the woman retains control over the discretions of her consulting physician and that the provision was 'not burdensome or chilling,' manifesting a legitimate interest of the state 'that this important decision has in fact been made by the person constitutionally empowered to do so,' and did not interpose 'the state or third parties in the decisionmaking process.' The Supreme Court said that it did 'not disagree with the result reached by the District Court' and explained:

'The decision to abort, indeed, is an important and often a stressful one, and it is desirable and imperative that it be made with full knowledge of its nature and consequences. The woman is the one primarily concerned, and her awareness of the decision and its significance may be assured, constitutionally, by the State to the extent of requiring her prior written consent.'

"In *Fitzpatrick,* the three-judge district court approved an informed consent provision, which was buttressed by criminal sanctions, requiring the physician or a counselor to advise the pregnant woman (a) that there may be detrimental physical and psychological effects which are not foreseeable, (b) of possible alternatives to abortion, including childbirth and adoption, and (c) of the medical procedures to be used. The decision of that court was affirmed without opinion, the Supreme Court simply citing *Danforth.*

The significance of *Fitzpatrick* is open to question because of the Supreme Court's failure to write an opinion and the observation of that court in *Danforth* in footnote 8 that:

> 'The appellants' vagueness argument centers on the word "informed." One might well wonder, offhand, just what "informed consent" of a patient is. The three Missouri federal judges who composed the three-judge District Court, however, were not concerned, and we are content to accept, as the meaning, the giving of information to the patient as to just what would be done and as to its consequences. To ascribe more meaning than this might well confine the attending physician to an undesirable and uncomfortable straitjacket in the practice of his profession.'

> " . . . [T]he segments of the Nebraska statute under attack here do impose criminal penalties for violation and do apply before viability of the fetus . . . The requirement[s of the Nebraska stat-ute are] apparently not unconstitutional[, therefore,] if (1) compliance puts no articulable burden upon the decisionmaking process or (2) the burden is not for furtherance of the state's interest in the potential life of the fetus, and is tightly drawn to effectuate only some other legitimate interest of the state."

One decision of the Supreme Court of the United States has come down since the above statement: *Bellotti v. Baird,* supra. That decision, while possibly indicating some retreat from the stiff no-interference-during-the-first-trimester standard clearly adopted in *Roe v. Wade,* 410 U.S. at 164, 93 S.Ct. 705, addressed only the family and its role in society. In that respect, the *Bellotti v. Baird* decision appears limited to state legislation affecting the parents' role in the minor's abortion decision. In any event, it would take a clearer signal from the Supreme Court than that in *Bellotti v. Baird* to demonstrate a retreat from the strict standard announced previously in *Roe v. Wade* and its progeny.

The defendants contend:

> " . . . Where the obstacle does not impinge upon the woman's freedom to make a constitutionally protected decision, or if they merely make the physician[']s work more laborous [sic] or less independent without any impingement on the patient, *Whalen, supra,* 97 S.Ct. 879, the regulations are evaluated under a relaxed standard of scrutiny and the state is afforded broader power to encourage actions thought to be in the public interest. These regulations are subject to the 'less demanding test of rationality,' *Maher, supra,* 97 S.Ct. at 2385, and thus usually found constitutional. *Wynn v. Scott, supra.*"

Pretrial Brief of Defendants, pp. 13–14 Strictly read, this contention is correct. What the defendants contend, however, must not be confused with the facts of the case at bar. The major bones of contention in this case involve the requirements that a woman be exposed to certain information sufficient to constitute an "informed consent" within the terms of the statute and that she wait forty-eight hours after receiving that information before she may obtain an abortion. Absent an emergency situation, the informed-consent and waiting-period requirements would stand between the woman's desiring an abortion and obtaining one. This is a *direct obstacle* to abortion, and the *Maher v. Roe* decision specifically speaks to this:

> " . . . Although a state-created obstacle need not be absolute to be impermissible, . . . we have held that a requirement for a lawful abortion 'is not unconstitutional unless it unduly burdens the right to seek an abortion.' *Bellotti v. Baird,* 428 U.S. 132, 147 [96 S.Ct. 2857, 2866, 49 L.Ed.2d 844] (1976). . . ."

432 U.S. at 473, 97 S.Ct. at 2382. See, also, *Maher v. Roe,* 432 U.S. at 475, 97 S.Ct. 2376.

One comment should be made about the evidence in relation to the standard of review before evaluating the specific sections. The Supreme Court's current position regarding interference with the

doctor-patient relationship in the first trimester of pregnancy is very strict: the state may interpose few, if any, restrictions in that area. Compare *Roe v. Wade,* 410 U.S. at 163–164, 93 S.Ct. 705, with *Planned Parenthood of Missouri v. Danforth,* 428 U.S. at 67, n. 8, 96 S.Ct. at 284, n. 8 (the state may not "confine the attending physician in an undesired and uncomfortable straitjacket in the practice of his profession"). The defendants contend that the Supreme Court, when making these rulings, did not envision the possibility that they would create abortion factories churning out assembly line abortions. The defendants argue that the Supreme Court has relied upon two assumed medical facts: (1) that there are relatively few complications, either short- or long-term, and almost universal safety in trimester abortions, and (2) that the physician-patient relationship is such that a woman seeking an abortion will openly confide in her physician, who in turn will probe her conscience and answer her questions. The defendants, in building an appellate record, have sought to refute these underlying assumptions by presenting extensive evidence on this subject. I make no findings of fact with respect to the greatest part of this evidence; that is not appropriate, it would seem, until the Supreme Court is ready to overrule *Roe v. Wade* or at least substantially limit it. I only make those findings of fact necessary to appraise this legislation pursuant to current constitutional standards. In this respect, it cannot be overemphasized that the challenged legislation does not differentiate with respect to trimesters of pregnancy. Thus, all of the legislation must be judged according to the most rigorous standard—that reserved for legislation touching upon the first trimester of pregnancy. See *Roe v. Wade,* supra; *Planned Parenthood of Missouri v. Danforth,* supra.

### B.

The plaintiffs challenge the reporting section, 28–343, as well as its accompanying penalty section, 28–344, on the ground that it is void for vagueness. Section 28–343 provides that the attending physician shall complete a form, established by the Bureau of Vital Statistics, for "every abortion performed or prescribed." The form is to include such information as the age of the pregnant woman, the type of procedure performed, any complications arising during that procedure, and the reasons for which the abortion was requested.[18] Section 28–343 lists the items to be included in the form and states that the form "shall include only" those items. The items relate to abortions which are "performed;" none of these items, however, relate to an abortion "prescribed." Interestingly, the two locations in the form required by the predecessor of L.B. 316 to contain information about prescribed abortions do not now re-

---

18. "28–343. The Bureau of Vital Statistics, Department of Health, shall establish an abortion reporting form, which shall be used for the reporting of every abortion performed or prescribed in this state. Such form shall include only the following items:
(1) The age of the pregnant woman;
(2) The location of the facility where the abortion was performed;
(3) The type of procedure performed;
(4) Complications, if any;
(5) The name of the attending physician;
(6) The pregnant woman's obstetrical history regarding previous pregnancies, abortions, and live births;
(7) The stated reason or reasons for which the abortion was requested;
(8) The state of the pregnant woman's legal residence;
(9) The length and weight of the aborted child, when measurable; and

(10) Whether an emergency situation caused the physician to waive any of the requirements of section 28–327 or 28–333. "The completed form shall be signed by the attending physician and sent to the Bureau of Vital Statistics within fifteen days after each reporting month. The completed form shall be an original, typed or written legibly in durable ink, and shall not be deemed complete unless the omission of any item of information required shall have been disclosed or satisfactorily accounted for. Carbon copies shall not be acceptable. The abortion reporting form required under this section shall not include the name of the person upon whom the abortion was performed. The abortion reporting form required under this section shall be confidential and shall not be revealed except upon the order of a court of competent jurisdiction in a civil or criminal proceeding."

quire such information. In L.B. 316, the legislature deleted the words "or prescribed" from the present subsections numbered (2) and (3). I preliminarily enjoined § 28–343 only insofar as it requires the reporting of prescribed abortions, and reasoned as follows:

" . . . Failure to eliminate the words 'or prescribed' at the beginning of the section, which declares that the reporting form 'shall be used for the reporting of every abortion performed *or prescribed* in this stage,' leaves the physician in a position of being charged criminally for failing to report a 'prescribed' abortion, although the form mandated by the statute, which is to contain only certain information, allows no reporting of abortions prescribed but not performed. . . . "

Memorandum of April 20, 1979

Little evidence was adduced at trial regarding the reporting section. The plaintiff physicians did testify to the effect that they would not know how to comply with the requirement of reporting prescribed abortions. Nothing, however, was adduced which would command a different response from the court on the matter. Section 28–343 will be permanently enjoined, insofar as it requires the reporting of "prescribed" abortions.

 With respect to the remainder of the reporting section, the plaintiffs raise no serious questions. The information requested is not vague, excessive, or abusive. The state has the power to gather such information. See *Planned Parenthood of Missouri v. Danforth,* 428 U.S. at 80–81, 96 S.Ct. 2831. The remainder of § 28–343 is constitutional.

### C.

Sections 28–326(8), 28–327, 28–328, 28–333, and 28–334 contain the "informed consent" provisions of the Nebraska abortion law. Sections 28–328 and 28–334 provide criminal penalties for failure to comply with §§ 28–327 and 28–333 respectively; § 28–326(8) defines informed consent. These provisions provide in relevant part:

§ 28–326(8)

"Informed consent shall mean a written statement, voluntarily entered into by the person upon whom an abortion is to be performed, whereby she specifically consents to such abortion. Such consent shall be deemed to be an informed consent only if it affirmatively appears in the written statement that the person upon whom the abortion is to be performed has been advised (a) of the reasonably possible medical and mental consequences resulting from an abortion, pregnancy, and childbirth, (b) of possible alternatives to abortion, including childbirth and adoption and including that there are agencies and services available to assist her to carry her pregnancy to a natural term, and (c) of the abortion procedures to be used. Such statement shall bear the signature of the person upon whom the abortion is to be performed and be signed by the attending physician;"

§ 28–327

"No abortion shall be performed on any woman in the absence of an informed consent, except that an abortion may be performed if, in the sound medical judgment of the physician, an emergency presents imminent peril that substantially endangers the life of the woman and the woman is unable to give informed consent."

§ 28–333

"No abortion shall be performed on any minor under the age of eighteen in the State of Nebraska without her informed consent unless an emergency situation exists.

"The informed consent by the minor shall be retained as part of the permanent record of the attending physician for no more than ten years. No person shall disclose any information contained in the informed consent, including the identity of the woman seeking the abortion, without the woman's written authorization or pursuant to an order issued by a court of competent jurisdiction. The Legislature hereby establishes a right of privacy in the

State of Nebraska for a cause of action against persons making unauthorized disclosure in violation of this act." [19]

The plaintiffs contend that the informed-consent provisions are void for vagueness, violate the Equal Protection Clause, and unduly burden a woman's freedom to decide to terminate her pregnancy.

The defendants advance two arguments on behalf of the constitutionality of the informed-consent sections. First, they assert that the requirement of an informed consent does not impinge on the pregnant woman's decisionmaking process and therefore they only need show a rational interest supporting that requirement to sustain it. *Maher v. Roe,* supra. Second, they interpret the informed-consent requirement "only to require that the physician not perform an abortion in the absence of an in-

formed consent which is a written document voluntarily entered into in which the patient makes certain affirmative statements regarding the procedure." Defendants' Post-Trial Brief, p. 37. The defendants argue that this greatly reduces the burden imposed on the physician, because:

". . . If the document is voluntarily executed by the woman and contains the signature of the attending physician, the prosecutor cannot look further to determine if, in fact, she had been informed of the identified information."

*Id.*

I have already addressed the second argument and rejected it in an opinion dated August 9, 1979, when it was made in support of the defendants' motion to dismiss on abstention grounds. The defendants' suggested interpretation would strain a plain reading of that section.[20] With respect to

---

19. The portions of § 28–333 relating to parental consent have been omitted, as the court has previously granted summary judgment for the plaintiffs on those portions by order dated August 1, 1979.

20. In a memorandum and order dated August 9, 1979, I rejected the defendants' suggested interpretation of the section and reasoned as follows:

"The defendants contend that the foregoing provisions may be construed by the Supreme Court of Nebraska so that a prima facie case for compliance would be made merely by the statement's bearing the signatures of both the person seeking the abortion and the attending physician. This construction, the defendants argue, would alleviate any burden on the abortion procedure, because the attending physician would not be obliged to give to the patient the required information or to ascertain that somebody else had given it to her. The defendants contend that the proposed construction would materially change the nature of the constitutional questions posed by the provisions and therefore this court should abstain, pending an interpretation by the Supreme Court of Nebraska.

\* \* \* \* \* \*

"While I grant that the proposed construction of the informed consent provisions would significantly affect the nature of the constitutional questions involved, I do not agree that the state statute is susceptible of the suggested construction. Such a construction would strain a plain reading of the statute. The provisions instruct that no physician may perform an abortion in the absence of an informed consent. A natural

inference of this is that the physician must know that an informed consent has been executed. Unless a doctor or his agent informs the patient according to § 28–326(8), I do not see how the physician could be assured that the statute has been complied with. One bit of advice required by the provision—that the patient be advised of the abortion procedures 'to be used'—reinforces this conclusion. Who else but the physician or one of the physician's agents would be in a position to tell the patient which abortion procedure is 'to be used' by the physician? Another requirement of the provision—that the consent be signed by both the patient and her physician—militates toward the same conclusion. "The defendants assert that the dual signature requirement means no more than that the doctor must sign the form, and that he is in a position to accept a patient's word that she has received such advice. This alone would satisfy, at least to the extent of creating a prima facie case of compliance with, the statute. I see no indication of this, however, in the statute. The provision requires the signatures of the patient and the physician by the use of different language. While the informed consent statement must 'bear the signature' of the patient, it must 'be signed' by the physician. Although the use of different language to describe a similar or identical action often indicates an intent on the part of a legislature to differentiate these actions for some purpose, I do not see that use of such a differentiation could point toward the conclusion the defendants urge. At most it could indicate that the patient need not personally sign—she could cause some-

the first argument, I have indicated in section III*A*3 above that this is not an accurate characterization of the effect of the informed-consent requirement. Without an informed consent, the woman seeking an abortion could not obtain one. The informed-consent requirement thus places a direct obstacle between the woman and the abolition. It must be judged according to this effect.

■■■■ The main thrust of the plaintiffs' vagueness argument centers on subsection (a) of § 28–326(8). Subsection (a) requires that a woman seeking an abortion indicate that she has been advised of the "reasonably possible medical and mental consequences resulting from an abortion, pregnancy, and childbirth." The plaintiffs adduced testimony that indicated confusion as to the meaning of "reasonably possible" medical and mental consequences. The defendants put on contrary evidence. To the extent that a factual finding in this area provides a background for the legal resolution of this issue, I find the defendants' evidence more persuasive. Consequences which are "reasonably possible" are not an impermissibly vague concept. "Possible" consequences are those which have the potential for occurrence. "Reasonably" possible consequences are a subset of possible consequences limited by the bounds of reasonableness. Certainly the concept of "reasonableness" cannot be beyond comprehension. Both plaintiff physicians indicated that they understood the concept of reasonably possible consequences, but that when the idea was fortressed with criminal penalties, rather than civil penalties, they no longer understood its range. The introduction of different penalties does not, however, change the language. The severity of sanctions goes to burden, not vagueness. This phrase gives a person of ordinary intel-

ligence fair notice as to the subject matter of the statute. It would not encourage arbitrary and erratic arrests and convictions. Moreover, the evidence produced on this subject confirms this conclusion.

The upshot of the plaintiff physicians' testimony was apparently meant to demonstrate that the "reasonably possible" standard would have a "chilling effect" on the exercise of their constitutional rights. One of the plaintiffs even testified that he would consider terminating his abortion practice if subsection (a) were upheld. The inhibition of the exercise of constitutionally protected rights, however, would not here be a result of "the uncertainty induced by the statute," as required by the *Colautti* court, 439 U.S. at 391, 99 S.Ct. at 683, but rather by fear of criminal penalties. Subsection (a) is neither vague nor overbroad.

The plaintiffs also argue that because experts disagree about the scope of "reasonably possible" consequences, this would permit arbitrary prosecutions according to whichever expert happened to advise the prosecutor. Rather than arbitrary prosecutions, however, the foregoing means that a specialist in obstetrics and gynecology would have to cover a range of disagreement in his profession regarding such consequences in order fully to ensure against criminal prosecution. Moreover, the question is not the extent—whether great or small—of the range of disagreement; the question for vagueness purposes is whether that range can be ascertained. I find, as a matter of fact and law, that that range is ascertainable, and, incidentally, that that range is not as great as the plaintiffs suggest. No vagueness problems inhere.

■■■ In addition to their attack on the concept of "reasonably possible" consequences found in § 28–326(8)(a), the plaintiffs make other vagueness challenges to

one else to do it for her, perhaps—but the physician must personally sign the form. That does not go to the question of whether the physician must personally give information to the patient or ascertain that someone else has done it adequately.

"Because the construction offered by the defendants would strain a plain reading of the

provisions in question, I conclude that the provisions are not susceptible of this construction in order to warrant deference to the state courts under the abstention doctrine. The defendants' motion must therefore be denied."

the informed-consent provisions. They point to the discrepancy between the exceptions to the informed-consent requirement in §§ 28–333 and 28–327. Section 28–327, which prohibits the performing of an abortion on *any woman* in the absence of an informed consent, excepts those abortions where "an emergency presents imminent peril that substantially endangers the life of the woman and the woman is unable to give informed consent." Section 28–333, which pertains to the informed-consent requirement for *minors*, excepts those abortions in the context of an "emergency situation." Section 28–326(7) defines "emergency situation" as follows:

"Emergency situation shall mean a condition exists that in the sound medical judgment of the physician the abortion should be performed without delay so as not to adversely affect the best physical or mental health of the woman."

By their language, both §§ 28–327 and 28–333 apply to minors. Yet of these two emergency exceptions to the informed-consent requirement, that contained in § 28–327 is more restrictive than that contained in § 28–333. These conflicting exceptions to the informed-consent requirement bear the potential of placing the physician in an irreconcilable dilemma, when he must determine which "emergency" standard governs the performing of an abortion sans informed consent. The appropriate way to solve this impermissibly vague situation is to enjoin one of these sections. Because § 28–327 speaks to all women and because the legislature obviously intended an informed-consent requirement to apply to all women, the enjoining of the enactment specifically addressing minors which has created this disjointed situation—§ 28–333—would better preserve the legislature's intent. Therefore, the first paragraph of § 28–333, as it now stands,[21] will be enjoined.

With respect to the second paragraph of § 28–333, the plaintiffs argue that the term "attending physician" is vague. I have previously rejected this argument; a plain reading of the section indicates that it is to mean the physician who physically performs the abortion.[22] In addition, the plaintiffs argue that the requirement that the informed consent "be retained as part of the permanent record" of the physician "for no more than ten years" is vague and contradictory. They ask:

". . . May the physician obtain the document and immediately destroy it? This would certainly not qualify as retention in the permanent records. May the physician obtain the document, place it in the permanent records and immediately remove and discard it? A literal reading would permit this conduct which render [sic] this statute meaningless."

Post-Trial Brief of Ladies Center, p. 18

The plaintiffs make a convincing argument on this point, and the first sentence of the second paragraph of § 28–333 will be stricken for vagueness.

Because the informed consent and parental consultation features of § 28–333 are unconstitutional, the concomitant penalty provision—§ 28–334—stands as an empty shell.[23]

The Equal Protection argument, once the standard of review is reduced to traditional rational-relation grounds, see section III.A2 above, quickly fails. Only one example is necessary. One legitimate state interest surrounding the abortion decision is maternal health. That this is an interest of the state is obvious both from a reading of the declaration of purpose and from a reading of the informed consent section. That is not a sufficiently compelling interest to justify constitutionally a significant burden

---

**21.** The parental consultation provision of § 28-333 has previously been enjoined. See footnote 3, supra.

**22.** *Womens Services v. Thone,* CV79–L–85 (unreported memorandum U.S.D.C.Neb. April 20, 1979, p. 9).

**23.** The plaintiffs make other arguments regarding §§ 28–333 and 28–334. In light of my holding that the informed-consent requirement of § 28–333 must be enjoined, I need not address those arguments.

on the woman seeking an abortion prior to the second trimester of pregnancy, but it is nonetheless legitimate. A state may reasonably conclude that a requirement that a decision to abort be informed would promote the psychological health of the pregnant woman. Therefore, such an informed-consent requirement bears a rational relation to a legitimate state interest.

■ The informed-consent requirement does in significant part fail the substantive due process test. As a whole, it unduly burdens a woman's freedom to decide to terminate, and freedom to terminate, her pregnancy. Considering the threat of criminal penalties for failure to comply with this provision, a physician or an assistant to a physician would unquestionably have to run a gamut of considerations to be assured that the subjects required by these sections to be covered had been covered. Testimony at trial showed that it would take several hours to "advise" (which means more than a cursory listing) a pregnant woman of all the "reasonably possible consequences" of abortion, pregnancy and childbirth. Specifics and detail need not be listed; they are abundantly found in the record. The punch of the statute is from the requirement that the patient be informed of the reasonably possible consequences not only of abortion, but also of pregnancy and childbirth. By refusing to allow the physician an opportunity to tailor this information to the patient, this provision also confines the physician in an unconstitutional straitjacket.

Moreover, the nature of the state's interest—presumably that of maternal health—is not compelling during the first trimester. However, even if that interest were compelling, subsection (a) even by itself is not narrowly drawn to effectuate only that interest. It surpasses the proper limits of "informed" when a woman seeking an abortion must learn about the myriad of medical and mental consequences reasonably resulting from pregnancy and childbirth.

Section 13 of L.B. 316 is a severability clause. It permits the severing of unconstitutional portions of a section without an effect on the remainder of that section.[24] Subsection (a) imposes an unconstitutional burden; the remainder of § 28–326 does not. Subsection (a) of § 28–326(8) will be severed.

■ Subsections (b) and (c) of § 28–326(8) do not unduly burden either a woman's decisionmaking process or her obtaining an abortion. *Planned Parenthood Association v. Fitzpatrick*, 401 F.Supp. 554 (U.S. D.C. E.D. Pa. 1975), aff'd *sub nom. Franklin v. Fitzpatrick*, 428 U.S. 901 (1976). The time required to convey the information is negligible and the state interest in having it conveyed—that the woman seeking an abortion be aware of the fundamental aspects of the procedure and the fundamental alternative—is tangible. This burden does not reach the degree of requiring any more than a tangible degree of state interest to justify it. Cf. *Planned Parenthood of Missouri v. Danforth*, supra. Moreover, the means of implementing that interest is not so broad as to cause concern.

Mention was made during trial of infanticide's being a possible alternative to abortion, the inference being that an informed consent pursuant to § 28–326(8)(b) would include this measure. It is not conceivable, however, that the legislature intended for the woman seeking an abortion to be informed of infanticide. It is similarly not conceivable that a physician would be prosecuted for failing to so inform a patient. Such a chimera of counsel poses no genuine burden.

Severing subsection (a) from § 28–326(8) is consistent with legislative intent. The overriding legislative intent expressed in L.B. 316 is to regulate abortion to the greatest extent within constitutional bounds.

Subsection (a) of § 28–326(8) will be severed from the remainder of that section, will be declared unconstitutional, and will

---

24. "Sec. 13. If any section in this act or any part of any section shall be declared invalid or unconstitutional, such declaration shall not affect the validity or constitutionality of the remaining portions thereof."

be permanently enjoined. Also, the first paragraph and the first sentence of the second paragraph of § 28–333 will be permanently enjoined. The remainder of § 28–326(8) is constitutional, *Planned Parenthood Association v. Fitzpatrick,* supra, and it and the remaining informed-consent provisions will be upheld.

### D.

The plaintiffs challenge the forty-eight-hour waiting period from the time the physician obtains an informed consent to the time he may perform an abortion, required by § 28–327[25] and enforced by § 28–328. They claim that the mandated waiting period both violates the Equal Protection Clause and imposes an undue burden on the woman's freedom to obtain an abortion. Because the waiting period does impose an undue burden, the Equal Protection challenge need not be reached.

The stipulation entered into between counsel and the testimony at trial document the increased cost which a woman from western Nebraska, for example, would incur in obtaining an abortion in Nebraska, were this requirement in effect. As the only abortion clinics in Nebraska are found in the Omaha area, the forty-eight-hour delay would cause her either to make one additional trip to this area or to stay in Omaha the duration of the waiting period. The obvious costs imposed by this waiting period are time, expense and delay. There was conflicting testimony about the amount of increase in risk to the pregnant woman's health caused by the delay. Even if the risk increase were small, it would amount to a secondary type of burden imposed by the waiting period. I find, as a matter of fact, however, the increased risk to be substantial.

The state interest, it seems, is that the woman seeking an abortion should make a thoughtful decision after receiving the information required by the informed consent

and more fully realizing her capacity to obtain an abortion. While this may be legitimate, it is not sufficiently compelling to justify the burdens imposed by this direct obstacle to abortion. It must be recalled that this waiting period attaches to the first trimester, the trimester for which the most exacting judicial scrutiny applies. See *Roe v. Wade,* 410 U.S. at 164, 93 S.Ct. 705. For the foregoing reasons, the waiting-period requirement must be permanently enjoined.

---

25. Section 28–327 provides in relevant part: "No abortion shall be performed on any woman without the passing of at least forty-eight hours between the expression of informed consent and the actual performance of the abortion unless, in the sound medical judgment of the physician, an emergency situation exists."