**Dr. Richard LEIGH, Individually and on behalf of his patients and on behalf of all other physicians and persons similarly situated; and Jane Bovard, Individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**Allen I. OLSON, Individually and as Attorney General of the State of North Dakota; James T. Odegard, Individually and as Grand Forks County State's Attorney; Cynthia A. Rothe, Individually and as Cass County State's Attorney; Dr. Jonathan B. Weisbuch, Individually and as State Health Officer of the North Dakota Health Department, Defendants.**

Civ. No. A3–79–78.

United States District Court,
D. North Dakota,
Southeastern Division.

Sept. 26, 1980.

C. Nicholas Vogel, Atty., Red River Valley Chapter of American Civil Liberties Union, Fargo, N. D., for plaintiffs.

Mervin Nordeng, Asst. State's Atty., Fargo, N. D., for Cynthia A. Rothe.

A. R. Hausauer, Jr., Asst. State's Atty., Grand Forks, N. D., for James T. Odegard.

Allen I. Olson, Atty. Gen. and Rick D. Johnson, Asst. Atty. Gen., Bismarck, N. D., for Allen I. Olson.

## MEMORANDUM AND ORDER

BENSON, Chief Judge.

Plaintiffs in this action contend that certain provisions of the North Dakota Abortion Control Act, N.D.Cent.Code ch. 14–02.-1, violate the constitutional right of women to obtain an abortion in the first trimester of pregnancy. In its order of July 9, 1979, the court preliminarily enjoined the enforcement of N.D.Cent.Code §§ 14–02.1–02(4), 14–02.1–03, and 14–02.1–06, relating to informed consent to abortion, a mandatory forty–eight hour waiting period, parental notification in cases involving unemancipated minors, and the solicitation of abortions. The parties have filed cross motions for summary judgment pursuant to F.R. Civ.P. 56, supported by affidavits, deposition testimony, and other exhibits. The affidavits do raise some genuine issues as to material facts but the parties have agreed that the court may treat the case as having been fully presented. Judgment is therefore appropriate. *U. S. Manganese Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 576 F.2d 153, 156 (8th Cir. 1978).

Defendants have moved to dismiss plaintiffs' challenge to N.D.Cent.Code § 14–02.1–08, relating to the protection of a viable fetus born alive. Plaintiffs concur in the motion to dismiss, conceding that they lack standing to attack the statute because plaintiff Leigh does not generally perform abortions after the first trimester of preg-

nancy, and plaintiff Bovard does not perform abortions.

The specific provisions of ch. 14–02.1 which are the subject of plaintiffs' motion for summary judgment are as follows: (1) § 14–02.1–02(4)(c), (d), and (f), which prescribes the information reasonably chargeable to the knowledge of the physician that must be disclosed to the woman seeking an abortion before an abortion may be performed; (2) § 14–02.1–03(1), which mandates a forty–eight hour waiting period after the woman is given the information required by § 14–02.1–02 before the abortion may be performed, and which requires that the parents of unemancipated minors be informed of their daughter's decision to obtain an abortion; (3) § 14–02.1–06, which prohibits the solicitation of abortions; (4) § 14–02.1–07(1)(a), which requires that certain records pertaining to abortions performed be maintained for seven years; and (5) § 14–02.1–09, which requires the humane disposal of nonviable fetuses. Section 14–02.1–11 imposes a criminal penalty for violation of any of the provisions of ch. 14–02.1.

■ Plaintiff Leigh is a board certified obstetrician–gynecologist in Grand Forks, North Dakota, who performs abortions. Plaintiff Bovard is a counselor who desires to give information and advice concerning abortion to women in North Dakota who seek such a service.[1] Plaintiff Leigh may assert the rights of those women who are seeking or will seek to obtain an abortion, for "it generally is appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision . . . ." *Singleton v. Wulff*, 428 U.S. 106, 118, 96 S.Ct. 2868, 2876, 49 L.Ed.2d 826 (1976).

## I. PRINCIPLES OF LAW APPLICABLE TO ABORTION.

### A. Substantive Due Process

■ The decision to obtain an abortion free from governmental interference is a fundamental right founded in the right of privacy implicit in the Constitution. *Roe v. Wade*, 410 U.S. 113, 153, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973). The state may limit the exercise of that fundamental right only when a compelling state interest is furthered thereby. The state has important interests in maternal health and in the preservation of potential human life, but neither of these interests are "compelling" in the first trimester of pregnancy, although they are legitimate. *Id.* at 162–63, 93 S.Ct. at 731. Any statute or regulation that unduly burdens the abortion decision in the first trimester of pregnancy is therefore invalid. *Maher v. Roe*, 432 U.S. 464, 473, 97 S.Ct. 2376, 2382, 53 L.Ed.2d 484 (1977); *Bellotti v. Baird*, 428 U.S. 132, 147, 96 S.Ct. 2857, 2866, 49 L.Ed.2d 844 (1976). A regulation that does not unduly burden the abortion decision is constitutional if it is rationally related to a legitimate state purpose. *Harris v. McRae*, —— U.S. ——, ——, 100 S.Ct. 2671, 2690, 65 L.Ed.2d 784 (1980); *Maher v. Roe, supra.*

### B. Equal Protection

■ A statutory classification based on a "suspect" criterion, such as race, may be upheld only if it furthers a compelling state interest. *Harris v. McRae, supra.* Statutory classifications based on non–suspect criteria will be upheld if they rationally further a legitimate state interest. *Id.* The regulation of abortion is not a suspect criterion. It is "inherently different than other medical procedures," —— U.S. at ——, 100 S.Ct. at 2692, and may therefore be subjected to different, more stringent standards than other medical procedures, if a legitimate state interest, such as the preservation of maternal health or the protection of potential life, is rationally furthered by the differential treatment. *Id.; Maher v. Roe, supra.* See also *Women's Services, P. C. v. Thone*, 483 F.Supp. 1022, 1041 (D.Neb.1979).

## II. THE ABORTION CONTROL ACT.

Plaintiffs place primary emphasis on the alleged due process violations of N.D.Cent. Code ch. 14–02.1.

---

1. This action was brought on behalf of the named plaintiffs and all others similarly situated. There has been no Rule 23 class certification, however.

### A. Informed Consent

N.D.Cent.Code § 14–02.1–03(1) provides that "[n]o physician shall perform an abortion unless prior to such performance the physician certified in writing that the woman gave her informed consent fully and without coercion, after the attending physician had informed the woman of the information contained in section 14–02.1–02. . . ." Section 14–02.1–02(4) defines "informed consent" as

> voluntary consent to abortion by the woman upon whom the abortion is to be performed only after full disclosure to her by the physician who is to perform the abortion of as much of the following information as is reasonably chargeable to the knowledge of the physician in his professional capacity:
>
> a. According to the best judgment of her attending physician, she is pregnant.
>
> b. The number of weeks elapsed from the probable time of the conception of her unborn child, based upon the information provided by her as to the time of her last menstrual period or based upon a history and physical examination and appropriate laboratory tests.
>
> c. The probable anatomical and physiological characteristics of the unborn child at the time the abortion is to be performed.
>
> d. The immediate and long–term physical dangers of abortion, psychological trauma resulting from abortion, sterility and increases in the incidence of premature births, tubal pregnancies and stillbirths in subsequent pregnancies, as compared to the dangers in carrying the pregnancy to term.
>
> e. The particular risks associated with her own pregnancy and the abortion technique to be performed.
>
> f. Alternatives to abortion such as childbirth and adoption and information concerning public and private agencies that will provide the woman with economic and other assistance and encouragement to carry her child to term including, if the woman so requests, a list of the agencies and the services available from each.
>
> g. In cases where the fetus may reasonably be expected to have reached viability and thus be capable of surviving outside of her womb, the attending physician shall inform the woman of the extent to which he is legally obligated to preserve the life and health of her viable unborn child during and after the abortion.

Plaintiffs attack only subsections (c), (d) and (f) of § 14–02.1–02(4), contending that they unduly burden the woman's fundamental right to decide, in consultation with her physician, to obtain an abortion.

In *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), the Supreme Court held that a state may require that the abortion decision be informed, and that there be documentation of the informed consent to abortion before the performance of abortion. *Id.* at 67, 96 S.Ct. at 2840. The informed consent provision in question in *Danforth* provided that "[n]o abortion shall be performed prior to the end of the first twelve weeks of pregnancy except: . . . (2) After the woman, prior to submitting to the abortion, certifies in writing her consent to the abortion and that her consent is informed and freely given and is not the result of coercion." *Id.* at 85, 96 S.Ct. at 2848. The Court appears to have concluded that the informed consent procedure imposed by the Missouri statute did not unduly burden the abortion decision, and that it furthered the state's legitimate interest in assuring that the decision to abort is made in a knowing, intelligent and voluntary fashion. *Id.* at 90, 96 S.Ct. at 2850 (Stewart, J., concurring). The Court indicated that a more detailed informed consent requirement may be overly intrusive into the private physician–patient relationship, thus constituting an undue burden on the exercise of the woman's fundamen-

tal right to make the abortion decision without governmental interference.[2]

> One might well wonder, offhand, just what "informed consent" of a patient is. The Missouri federal judges who composed the three–judge District Court, however, were not concerned, and we are content to accept, as the meaning, the giving of information to the patient as to just what would be done and as to its consequences. To ascribe more meaning than this might well confine the attending physician in an undesired and uncomfortable straitjacket in the practice of his profession.

*Id.* at 67 n.8, 96 S.Ct. at 2840 n.8. Thus, the state may not require physicians "to provide to each patient any and all information required by the state, regardless of its legality, truth, constitutionality or medical advisability." *Freiman v. Ashcroft,* 584 F.2d 247, 251 (8th Cir. 1978), *aff'd,* 440 U.S. 941, 99 S.Ct. 1416, 59 L.Ed.2d 630 (1979).

■ The North Dakota informed consent statute goes beyond the scope of the informed consent statute upheld by the Supreme Court in *Danforth* and goes beyond informed consent as that term is understood in the medical profession. It prescribes specific information that must be related to the patient, some of which may be of questionable truth and validity. Unless that information is given to the patient, the woman may not obtain an abortion. The informed consent requirement is thus a direct burden on the abortion decision. *See Colautti v. Franklin,* 439 U.S. 379, 386, 99 S.Ct. 675, 681, 58 L.Ed.2d 596 (1979); *Maher v. Roe, supra.*

Subsection (c) of § 14–02.1–02(4) requires the physician to disclose to his patient the "probable anatomical and physiological characteristics of the unborn child at the time the abortion is to be performed." This requirement imposes an undue burden on the abortion decision. The court finds that there is no legitimate medical reason for giving this information, and for some patients the description of the fetus may result in increased anxiety and emotional tension and may have an adverse medical effect on the patient.[3] The physician must be permitted to exercise medical judgment and determine to what extent, if any, disclosure in this area is in the patient's best interest. To require such disclosure to every patient impermissibly injects the state into the private physician–patient relationship. *Planned Parenthood Ass'n of Kansas v. Ashcroft,* 483 F.Supp. 679, 698 (W.D.Mo. 1980).

Subsection (d) of § 14–02.1–02(4) requires the physician to disclose to his patient the "immediate and long–term physical dangers of abortion, psychological trauma resulting from abortion, sterility and increases in the incidence of premature births, tubal pregnancies and stillbirths in subsequent pregnancies, as compared to the dangers in carrying the pregnancy to term." This requirement also imposes an undue burden on the abortion decision and impermissibly intrudes into the physician–patient relationship. The validity of the statutory implication that abortion increases the risks of sterility, premature births, tubal pregnancies, and still births in future pregnancies is a matter of serious dispute among medical experts.[4] It may not be in the best inter-

2. Although *Roe v. Wade, supra* held that the abortion decision be made in consultation with a physician, it is the woman's right that is protected. The physician has no fundamental right to perform an abortion or any other medical procedure. *Harris v. McRae,* –– U.S. ·, n.21, 100 S.Ct. 2671, 2689 n.21, 65 L.Ed.2d 784 (1980); *Whalen v. Roe,* 429 U.S. 589, 604 n.33, 97 S.Ct. 869, 879 n.33, 51 L.Ed.2d 64 (1977); *Akron Center for Reproductive Health, Inc. v. City of Akron,* 479 F.Supp. 1172, 1198 (N.D.Ohio 1979); *Women's Community Health Center, Inc. v. Cohen,* 477 F.Supp. 542, 550 (D.Me.1979). The due process violation arises only when the requirements imposed on the physician constitute an undue burden on the woman's decision. *Harris v. McRae, supra.*

3. Affidavit of Dr. Richard Leigh, at 3; Affidavit of Jay Katz, M.D., at 4.

4. *Compare* Affidavits of Richard Leigh, M.D., Christopher Tietze, M.D., and Leslie Iffy, M.D. *See New England Journal of Medicine,* vol. 301, no. 13, at 677 (Sept. 27, 1979) (there is little or no risk of spontaneous abortions after induced abortions when performed by current techniques); *American Journal of Obstetrics,* vol.

ests of every patient to impart the information prescribed by the statute.[5] Whether such information should be disclosed is a decision that must be left to the physician, in the exercise of his medical judgment. *Planned Parenthood Ass'n of Kansas City, supra.*

Subsection (f) of § 14–02.1–02(4) requires the physician to disclose to his patients "[a]lternatives to abortion such as childbirth and adoption and information concerning public and private agencies that will provide the woman with economic and other assistance and encouragement to carry her child to term including, if the woman so requests, a list of the agencies and the services available from each." Subsection (f) is an attempt by the state to encourage childbirth over abortion. The state may express a preference for childbirth over abortion and may encourage childbirth, *Harris v. McRae,* —— U.S. ——, ——, 100 S.Ct. 2671, 2686, 65 L.Ed.2d 784 (1980); *Maher v. Roe,* 432 U.S. 464, 474, 97 S.Ct. 2376, 2382, 53 L.Ed.2d 484 (1977), but it may not do so in a manner that unduly burdens the woman's right to decide whether or not to obtain an abortion. The information required to be disclosed by subsection (f) appears to be reasonably related to the giving of informed consent. *Margaret S. v. Edwards,* 488 F.Supp. 181, 211–12 (E.D.La.1980). The statute does not require that the physician personally tell the patient of all the agencies and services available, so it does not appear that significant delay will result from complying with the statute. There is no evidence that disclosing such information to the patient will harm her, physically or emotionally. Furthermore, Dr. Leigh has indicated an intention to employ an "in–house counselor" who presumably would assist in meeting this requirement of the statute.[6] Plaintiffs

have thus failed to show that the requirements of subsection (f) unduly burden the abortion decision. *Margaret S. v. Edwards, supra; Women's Services, P. C. v. Thone,* 483 F.Supp. 1022, 1049 (D.Neb.1979); *Women's Community Health Center, Inc. v. Cohen,* 477 F.Supp. 542, 550 (D.Me.1979). Subsection (f) also does not appear to be unconstitutionally vague. The physician is required by § 14–02.1–02(4) to disclose only that information *reasonably chargeable to his knowledge.* The physician is thus given fair notice of what is required of him; he must disclose as much of the required information as he knows or reasonably should know. *See United States v. Harriss,* 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954). *Compare Planned Parenthood Ass'n of Kansas City v. Ashcroft,* 483 F.Supp. 679 (W.D. Mo.1980), where a statute which required the physician to inform his patient of the alternatives to abortion, including a list of the public and private agencies and services that will assist her before and after birth, without regard to whether the physician actually knew or should have known of the existence of the agencies and services, was held unconstitutionally vague. *Id.* at 699.

The court holds that subsections (c) and (d) of § 14–02.1–02(4) are unconstitutional because through them the state has impermissibly injected itself into the private physician–patient relationship, and thus into the abortion decision process. The state through § 14–02.1–02(4)(c) and (d) substitutes its judgment for the medical judgment of the physician in a manner that is of questionable factual and scientific validity and not always in the best interest of the individual patient. Such intrusion is substantial and direct, and thus unduly burdens the woman's right to decide in consultation with her physician, free from governmental interference, whether or not to terminate her pregnancy.

---

136, at 19 (1980) ("Offspring of women with a proximate induced abortion had *no* higher frequency of short gestations, low Apgar scores, or congenital malformations than those born of women with no prior loss. Offspring of secundigravidas with a proximate abortion had birthweights similar to those of other primigravidas. Thus we have found that women with a single

prior induced abortion have no increased risk of poor outcome of the next pregnancy of 27 weeks' gestation.")

**5.** Affidavit of Richard Leigh, at 3; Affidavit of Jay Katz, M.D., at 4.

**6.** Affidavit of Richard Leigh, at 2.

The question of whether the informed consent requirements of ch. 14–02.1 unduly burden the abortion decision is necessarily one of degree. *Maher v. Roe*, 432 U.S. at 473, 97 S.Ct. at 2382; *Bellotti v. Baird*, 428 U.S. at 149–150, 96 S.Ct. at 2867. The state may regulate in this area, *Danforth, supra*, but it may not substitute its judgment for the medical judgment of the attending physician.[7]

### B. Mandatory Waiting Period

N.D.Cent.Code § 14–02.1–03(1) provides in part that no physician shall perform an abortion more than thirty days nor less than forty–eight hours after the woman has been given the information required by § 14–02.1–02(4).

Dr. Leigh appears to be the primary and perhaps the sole physician in North Dakota who performs abortions in the first stage of pregnancy for reasons not necessarily related to the life and health of the mother. Consequently, the demand for his services is such that he performs approximately 2500 abortions each year. His clinic is in Grand Forks on the northeastern border of the state. Less than ten percent of his patients are from Grand Forks County, and many of his patients travel more than 200 miles from their homes to Grand Forks. The mandatory forty–eight hour waiting period would require women who must travel long distances either to make an additional trip to Grand Forks or to stay in Grand Forks for two nights. Because he does not work on weekends, a patient may have to wait four days, from Thursday to Monday, before the abortion is performed. The waiting period thus would impose an additional economic burden on those women seeking an abortion who must travel long distances. The additional expenses caused solely by the mandatory waiting period are undoubtedly a significant and substantial burden on a large number of women, especially on women in areas of western North Dakota who would have to travel over 400 miles to obtain an abortion. The mandatory waiting period would burden such women with the additional expenses of an extra trip or of lodging and meals, and would substantially increase the time away from their jobs and their families.

The waiting period may also result in additional mental anguish for a significant number of women seeking abortions.[8] It does not appear that the 48 hour waiting period would cause a significant increase in morbidity but the risks associated with a delay in the performance of an abortion would be increased if the women were required to wait four days.[9]

The court finds that the mandatory forty–eight hour waiting period of § 14–02.-

7. The validity of an informed consent statute depends upon the scope of the statute and must generally be decided on a case by case basis. In *Planned Parenthood Ass'n of Kansas City v. Ashcroft*, 483 F.Supp. 679 (W.D.Mo.1980), an informed consent statute almost identical of § 14 02.1 02(4) was held invalid. Similar and perhaps even more detailed informed consent provisions were held invalid in *Margaret S. v. Edwards*, 488 F.Supp. 181 (E.D.La.1980), and *Akron Center for Reproductive Health v. City of Akron*, 479 F.Supp. 1172 (N.D.Ohio 1979). A less detailed informed consent provision was held to be invalid in part in *Women's Services, P.C. v. Thone*, 483 F.Supp. 1022 (D.Neb.1979). The court in *Women's Community Health Center, Inc. v. Cohen*, 477 F.Supp. 542 (D.Me.1979) declined to preliminarily enjoin a relatively nonspecific informed consent provision. It appears that an informed consent statute of the type involved in *Danforth* that requires informed consent but leaves to the medical judgment of the doctor the specific information to be disclosed and more particularly does not prescribe the disclosure of information of doubtful validity would be constitutional.

8. *See* Lupfer and Sibler, *Two Surveys of Abortion Patients' Views of Mandatory Waiting Period* (Feb. 1980). This study, conducted in the Memphis, Tennessee area, found that twenty-nine percent of the women surveyed suffered additional mental anguish because of the forty–eight hour waiting period. *See also Margaret S. v. Edwards*, 488 F.Supp. 181, 212 (E.D.La. 1980) (24 hour waiting period); *Women's Services, P.C. v. Thone*, 483 F.Supp. 1022, 1050 (D.Neb.1979) (48 hour waiting period); *Planned Parenthood Ass'n of Kansas City v. Ashcroft*, 483 F.Supp. 679, 696 (W.D.Mo.1980) (48 hour waiting period); *Women's Community Health Center, Inc. v. Cohen*, 477 F.Supp. 542, 551 (D.Me.1979) (48 hour waiting period).

9. Affidavit of Dr. Richard Leigh, at 2. Deposition of Dr. Richard Leigh, at 60.

1–03(1) is a direct and substantial burden on the exercise of the woman's fundamental constitutional right to terminate her pregnancy, and on that finding holds it to be unconstitutional.

### C. Parental Notification

N.D.Cent.Code § 14–02.1–03(1) provides in part as follows:

> Prior to the period of pregnancy when the fetus may reasonably be expected to have reached viability, no abortion shall be performed upon an unemancipated minor unless the attending physician certifies in writing that each of the parents of the minor requesting the abortion has been provided by the physician in person with the information provided for in section 14–02.1–02 at least twenty–four hours prior to the minor's consent to the performance of abortion or unless the attending physician certifies in writing that he has caused materials of section 14–02.1–02 to be posted by certified mail to each of the parents of the minor separately to the last known address at least forty–eight hours prior to the minor's consent to the performance of abortion. When a parent of the minor has died or rights and interests of such parent have been legally terminated, this subsection shall apply to the sole remaining parent. When both parents have died or where the rights and interests of both parents have been legally terminated, this subsection shall apply to the guardian or other person standing in loco parentis.

In *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), the Court held that the state could not condition the minor's right to obtain an abortion on the consent of the parents. *Id.* at 75, 96 S.Ct. at 2843. Such a consent requirement gives a veto power to a person other than the woman seeking an abortion and her physician, and thus interferes with the minor's fundamental constitutional right of privacy. N.D. Cent.Code § 14–02.1–03(1) does not require parental consent to an abortion for a minor, but does require parental notification, actu-

al or constructive, in all cases where a minor seeks an abortion. *Danforth* did not address the issue of a parental notification requirement.

In *Bellotti v. Baird*, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979), the Court dealt with a statute providing that unmarried minors had to obtain the consent of both parents to undergo an abortion. If either parent refused consent, consent could be obtained by order of a judge, for good cause shown, after a hearing.

The Court discussed the constitutional rights of minors, and concluded that the constitutional rights of children cannot be equated with those of adults because of the peculiar vulnerability of children, their inability to make critical decisions in an informed and mature manner, and the importance of the parental role in child rearing. *Id.* at 634, 99 S.Ct. at 3043. The state thus has a legitimate interest in requiring parental notice and consent for important decisions that are made by minors.

> [P]arental notice and consent are qualifications that typically may be imposed by the State on a minor's right to make important decisions. As immature minors often lack the ability to make fully informed choices that take account of both immediate and long–range consequences, a State reasonably may determine that parental consultation often is desirable and in the best interest of the minor. It may further determine, as a general proposition, that such consultation is particularly desirable with respect to the abortion decision—one that for some people raises profound moral and religious concerns.

*Id.* at 640, 99 S.Ct. at 3046–3047 (footnotes omitted). But because the abortion decision involves a fundamental constitutional right that is possessed by minors as well as adults, *Danforth, supra*, the state must act with particular sensitivity when it legislates to foster parental involvement in the abortion decision. 443 U.S. at 642, 99 S.Ct. at 3047.

The Court held that the statute in question violated the rights of minors because it

required the consent of a third party, either the parents or a judge, before an abortion could be performed. The statute was also infirm in that it required that the parents be notified of any judicial proceedings commenced by the minor to obtain consent. *Id.* at 647, 99 S.Ct. at 3050. In holding that the mandatory notification requirement was an undue burden on the exercise by minors of the right to seek an abortion, the Court stated:

> As the District Court recognized, "there are parents who would obstruct, and perhaps altogether prevent, the minor's right to go to court." *Baird III,* [*Baird v. Bellotti,* D.C.Mass.,] 450 F.Supp. 997 at 1001. There is no reason to believe that this would be so in the majority of cases where consent is withheld. But many parents hold strong views on the subject of abortion, and young pregnant minors, especially those living at home, are particularly vulnerable to their parents' efforts to obstruct both an abortion and their access to court.

*Id.*

In an attempt to balance the rights of the parents, the interests of the state, and the fundamental right of the minor, the Court held that if judicial consent is required before a minor may obtain an abortion, the minor must have the right to commence the court proceedings without first consulting or notifying her parents. The first determination that the court must make is whether the minor is mature and well enough informed to make intelligently the abortion decision on her own. If she is, she must be allowed to act without parental consultation or consent. If she fails to satisfy the court that she is competent to make the abortion decision independently, she must be permitted to show that an abortion would nevertheless be in her best interests. If the court determines an abortion is in the minor's best interests, she is entitled to court authorization without any parental involvement. The court may also order parental involvement if it determines the minor's best interests would be served thereby. *Id.* at 647–48, 99 S.Ct. at 3050.

*Bellotti v. Baird* appears to hold that it may be desirable in most cases to notify the parents of their minor daughter's decision to abort but such notification may not be required in *every* case. *Id.* at 651, 99 S.Ct. at 3052. In the case of the mature minor capable of making an intelligent decision, the requirement of parental notification violates both of the privacy interests which underlie the fundamental right enunciated in *Roe v. Wade*; the individual interest in avoiding disclosure of personal matters and the interest in independence in making certain kinds of important decisions. *Whalen v. Roe,* 429 U.S. 589, 599–600, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977); *Bellotti v. Baird,* 443 U.S. at 655, 99 S.Ct. at 3054 (1979) (Stevens, J., concurring in judgment).

N.D.Cent.Code § 14–02.1–03(1) requires parental notification in every case, regardless of the maturity of the minor seeking an abortion. Such a requirement is constitutionally defective because it violates the privacy rights of the minor and is an undue burden on the exercise of the minor's right to obtain an abortion. *See Margaret S. v. Edwards,* 488 F.Supp. 181, 205 (E.D.La. 1980); *Akron Center for Reproductive Health v. City of Akron,* 479 F.Supp. 1172, 1202 (N.D.Ohio 1979); *Women's Community Health Center, Inc. v. Cohen,* 477 F.Supp. 542, 548 (D.Me.1979). *See also Planned Parenthood Ass'n of Kansas City v. Ashcroft,* 483 F.Supp. 679, 697 (W.D.Mo.1980), where the court held invalid a parental notification requirement on the ground that such notice could cause substantial delay and in some cases constitute an insurmountable obstacle to abortion. For a case decided before *Bellotti v. Baird* that uses this same reasoning and reaches the same result, *see Wynn v. Carey,* 582 F.2d 1375, 1388 (7th Cir. 1978).

A requirement of parental notification would likely create no problems in a great many cases because in those families where understanding and interdependence and support exist between family members, consultation with one or both of the parents would have naturally preceded the consultation with the physician. It is unrealistic,

however, to assume that such an intra–family relationship exists in every case, and where such a relationship does not exist, the required notification is less likely to result in an objective determination as to whether the minor is mature and well enough informed to make an intelligent abortion decision.

It is the requirement of parental notification in *all* cases that renders § 14–02.1–03(1) constitutionally defective. In the absence of a procedure by which the notification requirement would be made applicable only in those cases where the minor had not reached such maturity *to enable her to* make her own informed decision, the attending physician in the exercise of medical judgment, after consulting with the minor, must decide whether it is in the interest of the minor patient to notify the parents.

### D.  Solicitation

N.D.Cent.Code § 14–02.1–06 provides as follows:

> No licensed physician or licensed hospital, or any person employed by the licensed physician or licensed hospital, nor any other person shall advertise or participate in any form of communication having as its purpose the inviting, inducing, or attracting of a pregnant woman to undergo an abortion.

■ This section of the Code prohibits the advertising of abortion services. Plaintiffs do not advertise, but should they choose to do so, it could not be prevented. *See Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975).

Plaintiff Bovard's abortion counseling services may be considered as "inviting, inducing, or attracting." Likewise, Dr. Leigh's abortion services, including his discussions with his patients, may be considered as "inviting, inducing, or attracting." However, the statute is vague to such an extent that it is not clear such services are within its proscriptions. The statute has such a potentially broad application that a person of ordinary intelligence would not be able to determine whether conduct or an utterance is proscribed.

*Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *United States v. Harriss,* 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954).

As stated by this court in *Valley Family Planning v. State of North Dakota,* 489 F.Supp. 238, 243 (D.N.D.1980), "[t]he standards of permissible statutory vagueness are strict in the area of free expression and the state may regulate only with narrow specificity," *citing Keyishian v. Board of Regents,* 385 U.S. 589, 604, 87 S.Ct. 675, 684, 17 L.Ed.2d 629 (1967).

The question of whether the statute violates the first amendment need not be addressed but the court notes that the threat of criminal sanctions for communications having as their purpose inviting, inducing or attracting a pregnant woman to undergo an abortion would effectively deter the exercise of free speech. *Keyishian v. Board of Regents, supra.*

The court holds § 14–02.1–06 to be so vague that it violates the due process clause of the Fourteenth Amendment.

### E.  Recordkeeping

N.D.Cent.Code § 14–02.1–07(1)(a) provides as follows:

> All abortion facilities and hospitals in which abortions are performed shall keep records, including admission and discharge notes, histories, results of tests and examinations, nurses' work sheets, social service records, and progress notes, and shall further keep a copy of all written certifications provided for in this chapter as well as a copy of the constructive notice forms, consent forms, court orders, abortion reports, and complication reports. Records shall be maintained in the permanent files of the hospital or abortion facility for a period of not less than seven years.

■ In *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), the Court held valid a recordkeeping statute that required certain records pertaining to abortion to be maintained for seven years. *Id.* at 81, 96

S.Ct. at 2846. The Court stated that "[r]ecordkeeping and reporting requirements that are reasonably directed to the preservation of maternal health and that properly respect a patient's confidentiality and privacy are permissible." *Id.* at 80, 96 S.Ct. at 2846. The recordkeeping requirements of § 14–02.1–07(1)(a) appear to be reasonably directed to the preservation of maternal and public health. Section 14–02.-1–07(1)(b) assures the confidentiality of the records. The requirement that the records be maintained for seven years is not unreasonable. The recordkeeping requirements do not unduly burden the woman's right to decide to terminate her pregnancy. The statute is not impermissibly vague, for it can be construed to require that only the listed records and those records normally kept in the ordinary course of a physician's practice be kept. *See Women's Services, P. C. v. Thone,* 483 F.Supp. 1022, 1045 (D.Neb. 1979); *Planned Parenthood Ass'n of Kansas City v. Ashcroft,* 483 F.Supp. 679, 700 (W.D. Mo.1980). Section 14–02.1–07(1)(a) is therefore constitutional. Reports and records required by §§ 14–02.1–02(4)(c) and (d), 14–02.1–03(1) and 14–02.1–09 will not have to be maintained.

*F. Humane Disposal of Nonviable Fetus*

N.D.Cent.Code § 14–02.1–09 provides as follows:

> The licensed physician performing the abortion, if performed outside of a hospital, must see to it that the fetus is disposed of in a humane fashion under regulations established by the state department of health. A licensed hospital in which an abortion is performed must dispose of a dead fetus in a humane fashion in compliance with regulations promulgated by the state department of health.

N.D.Admin.Code § 33–03–02–04, which was promulgated pursuant to § 14–02.1–09, provides as follows:

> It shall be the duty of a hospital for abortions performed within a licensed hospital or it shall be the duty of the attending physician for abortions performed outside a licensed hospital to inform the patient or next of kin as to the options open for the disposal of the fetus (Appendix C). This form shall be executed in duplicate and shall be signed by the patient before the abortion is performed.

The "Appendix C" referred to in the regulation is a form which is to be filled out by the woman before an abortion may be performed. The form states as follows: "I do hereby request that the fetus severed from the body of the undersigned be disposed of in the following manner: (1) Be delivered to the undertaker for (burial) or (cremation) .... (2) Be delivered to (name of hospital), for disposal at the hospital's discretion."

The state may regulate the disposal of dead fetuses to protect the public health. *Planned Parenthood Ass'n v. Fitzpatrick,* 401 F.Supp. 554, 573 (E.D.Pa. 1975), *aff'd sub nom. Franklin v. Fitzpatrick,* 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1205 (1976). Section 14–02.1–09 is therefore constitutional on its face. It rationally furthers a legitimate state interest. It is not facially vague because it refers to "regulations established by the state department of health." The statute, although potentially vague, is capable of being made certain. *Compare Akron Center for Reproductive Health v. City of Akron,* 479 F.Supp. 1172, 1206 (N.D.Ohio 1979), where the court held void for vagueness an ordinance that required that "the remains of the unborn child [be] disposed of in a humane and sanitary manner," without defining "humane" or "sanitary."

The regulation promulgated by the state department of health in the instant case does not make the statute certain. The regulation does not offer a definition of "humane" or simply provide for disposal in a reasonable fashion. It places the burden of deciding the manner of disposal on the woman seeking an abortion and makes her decision a prerequisite to obtaining an abortion. It is thus a direct burden on the abortion decision. The state's legitimate interests in maternal health and the preservation of potential life are not furthered by the requirement. There is no rational rea-

son why the woman must choose the method of disposal and the court need not therefore decide whether the requirement unduly burdens the abortion decision. Section 14–02.1–09 is unconstitutional as applied.

### III. ORDER FOR JUDGMENT.

IT IS ORDERED that judgment be entered declaring Sections 14–02.1–02(4)(c) and (d), 14–02.1–03(1), 14–02.1–06, and 14–02.1–09 as applied, North Dakota Century Code, to be unconstitutional.

IT IS FURTHER ORDERED that the preliminary injunction entered in this case on July 9, 1979, is vacated.