**PLANNED PARENTHOOD OF MINNESOTA, a non-profit Minnesota Corporation; and Mildred Hanson, MD, Appellees,**

v.

**The STATE OF MINNESOTA; Rudy Perpich, as Governor of the State of Minnesota; and Hubert H. Humphrey, III, as Attorney General of the State of Minnesota, Appellants.**

No. 89–5400.

United States Court of Appeals,
Eighth Circuit.

Submitted May 14, 1990.

Decided Aug. 2, 1990.

480

Audrey Kaiser Manka, St. Paul, Minn., for appellants.

Rebecca Palmer, Minneapolis, Minn., for appellees.

Before LAY, Chief Judge, BOWMAN, Circuit Judge, and STUART,* Senior District Judge.

LAY, Chief Judge.

The issue before this court is whether the Minnesota fetal disposition law, Minn. Stat. § 145.1621 (1988), is constitutional. The district court[1] found the law unconstitutionally vague as well as infringing on a woman's right to abortion. *Planned Parenthood v. State of Minnesota,* No. 4–87–676 (D.Minn., June 30, 1989). The law regulates the disposal of fetal remains by hospitals, clinics and medical facilities in the state of Minnesota. Although we find the question close, we conclude, based in part on case law decided after the district court ruled, that the statute passes constitutional muster. We therefore reverse.

In 1987, Minnesota enacted a statute regulating the disposition of fetal remains resulting from abortions and miscarriages.[2] Planned Parenthood, a family planning service that offers first trimester abortions, along with Dr. Mildred Hanson, filed suit prior to the effective date of the statute, challenging its constitutionality on several grounds. The district court entered a pre-liminary injunction against enforcement of the statute, and on Planned Parenthood's motion, found the statute unconstitutional and entered a permanent injunction against enforcement on June 30, 1989. The state's appeal followed.

DISCUSSION

The Supreme Court has recognized the legitimate interest of states and municipalities in regulating the disposal of fetal remains from abortions and miscarriages. *See City of Akron v. Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 451–52 nn. 44, 45, 103 S.Ct. 2481, 2503–04 nn. 44, 45, 76 L.Ed.2d 687 (1983); *Planned Parenthood Ass'n v. Fitzpatrick,* 401 F.Supp. 554, 573 (E.D.Penn.1975), *aff'd, without opin. sub nom., Franklin v. Fitzpatrick,* 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1205 (1976); *see also Leigh v. Olson,* 497 F.Supp. 1340, 1351 (D.N.D.1980); *Margaret S. v. Edwards,* 488 F.Supp. 181, 221–22 (E.D.La.1980). Fetal disposal statutes have been struck down, however, as either unconstitutionally vague or as infringing on a woman's right to an abortion. *See Akron,* 462 U.S. at 451, 103 S.Ct. at 2503 (uncertain meaning of "humane and

---

* The HONORABLE WILLIAM C. STUART, Senior United States District Judge for the Southern District of Iowa, sitting by designation.

1. The Honorable David S. Doty, United States District Judge for the District of Minnesota.

2. The statute provides:

**DISPOSITION OF ABORTED OR MISCARRIED FETUSES.**
Subd. 1. **Purpose.** The purpose of this section is to protect the public health and welfare by providing for the dignified and sanitary disposition of the remains of aborted or miscarried human fetuses in a uniform manner and to declare violations of this section to be a public nuisance.
Subd. 2. **Definition; remains of a human fetus.** For the purposes of this section, the term "remains of a human fetus" means the remains of the dead offspring of a human being that has reached a stage of development so that there are cartilaginous structures, fetal or skeletal parts after an abortion or miscarriage, whether or not the remains have been obtained by induced, spontaneous, or accidental means.
Subd. 3. **Regulation of disposal.** Remains of a human fetus resulting from an abortion or miscarriage, induced or occurring accidentally or spontaneously at a hospital, clinic, or medi-cal facility must be deposited or disposed of in this state only at the place and in the manner provided by this section or, if not possible, as directed by the commissioner of health.
Subd. 4. **Disposition; tests.** Hospitals, clinics, and medical facilities in which abortions are induced or occur spontaneously or accidentally and laboratories to which the remains of human fetuses are delivered must provide for the disposal of the remains by cremation, interment by burial, or in a manner directed by the commissioner of health. The hospital, clinic, medical facility, or laboratory may complete laboratory tests necessary for the health of the woman or her future offspring or for purposes of a criminal investigation or determination of parentage prior to disposing of the remains.
Subd. 5. **Violation; penalty.** Failure to comply with this section constitutes a public nuisance. A person, firm or corporation failing to comply with this section is guilty of a misdemeanor.
Subd. 6. **Exclusions.** To comply with this section, a religious service or ceremony is not required as part of the disposition of the remains of a human fetus, and no discussion of the method of disposition is required with the woman obtaining an induced abortion.
Minn.Stat. § 145.1621 (1988).

sanitary" leaves statute too vague where criminal sanctions possible).[3] However, *Akron* makes clear that more carefully drawn regulations might suffice to "further [the government's] legitimate interest in proper disposal of fetal remains." *Id.* at 452 n. 45, 103 S.Ct. at 2504 n. 45.

## I. VAGUENESS

■ The fundamental test applied to criminal laws challenged as unconstitutionally vague is whether "men of common intelligence must necessarily guess at its meaning and differ as to its application." *Baggett v. Bullitt*, 377 U.S. 360, 367, 84 S.Ct. 1316, 1320, 12 L.Ed.2d 377 (1964); *see also Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). This test considers whether fair notice of the conduct prohibited is given, *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983), and whether the statute provides sufficient guidance to officials so that "arbitrary and discriminatory enforcement" is avoided. *Id.* at 357, 103 S.Ct. at 1858; *see also Papachristou v. City of Jacksonville*, 405 U.S. 156, 170, 92 S.Ct. 839, 847, 31 L.Ed.2d 110 (1972). Finally, the statute must be sufficiently clear so that the exercise of constitutionally protected rights is not restrained. *See Colautti v. Franklin*, 439 U.S. 379, 390–91, 99 S.Ct. 675, 683–84, 58 L.Ed.2d 596 (1979); *Grayned*, 408 U.S. at 109, 92 S.Ct. at 2299.

■ The challenger of a statute "must demonstrate that the law is impermissibly vague in all of its applications," *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982), and that the statute could never be applied in a valid manner. *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). Statutes should not be

declared unconstitutionally vague by speculating about possible hypothetical applications. If a law is susceptible of a reasonable interpretation which supports its constitutionality, the court must accord the law that meaning. *United States v. National Dairy Prod. Corp.*, 372 U.S. 29, 32, 83 S.Ct. 594, 597, 9 L.Ed.2d 561 (1963). With these standards in mind, we now turn to an evaluation of those portions of Minnesota's fetal disposal statute that the district court found impermissibly vague.

### A. Use of the Term "Dignified"

■ The district court found the Minnesota legislature's use of the term "dignified" in the introductory subsection colored all later references to the acceptable disposal methods in the statute. In *Webster v. Reproductive Health Servs.*, —— U.S. ——, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989), decided one week after the district court's opinion here, the Supreme Court found that a preamble to a Missouri abortion statute which stated "the life of each human being begins at conception" was not intended to be controlling or regulatory, but instead simply expressed "a value judgment." *Webster*, 109 S.Ct. at 3050. The Court added "it will be time enough for federal courts to address the meaning of the preamble should it be applied to restrict the activities of appellees in some concrete way." *Id.*

Although the term "dignified," standing alone, is no more definitive than "humane," stricken in *Akron*, it nonetheless does not ultimately control Minnesota's fetal disposal law. Introductory provisions of a statute must give way to the specific language in the operative sections of the statute. *See In re Atkinson*, 291 N.W.2d 396, 400 (Minn.1980). Under governing principles of statutory construction it is generally accepted that "the preamble * * * contrib-

---

**3.** *See also Margaret S. v. Treen*, 597 F.Supp. 636, 668–71 (E.D.La.1984) (fetal disposal statute requiring physician to inform woman that decision regarding disposal must be made equates fetus with a dead person requiring burial, thus psychologically burdening the abortion decision), *aff'd*, 794 F.2d 994 (5th Cir.1986); *Leigh*, 497 F.Supp. at 1351–52 (fetal disposal statute

unconstitutionally vague since it did not define "humane disposal" and required woman to determine method of disposal); *Margaret S. v. Edwards*, 488 F.Supp. at 221–23 (fetal disposal statute unconstitutionally burdened woman's right to abortion since it equated fetal remains with a dead human being).

utes to a general understanding of the statute, but it is not an operative part of the statute * * *. Where the enacting or operative parts of a statute are unambiguous, the meaning of the statute cannot be controlled by language in the preamble." *Jurgensen v. Fairfax County, Va.*, 745 F.2d 868, 885 (4th Cir.1984) (quoting *Association of Am. Railroads v. Costle*, 562 F.2d 1310, 1316 (D.C.Cir.1977)); *cf. United States Trustee v. Prines (In re Prines)*, 867 F.2d 478, 483–84 (8th Cir.1989) (declining to give dispositive weight to preamble language where doing so disregards language of operative section).

The Minnesota legislature expressly articulated the disposal methods that are acceptable: "cremation," "interment by burial," or "in a manner directed by the commissioner of health." Any ambiguity created by the preamble is obviated by these common terms with accepted meanings.[4] The Minnesota statute differs significantly from fetal disposal statutes using "humane," "dignified," or "sanitary" without limitation. *See, e.g., Akron*, 462 U.S. at 451, 103 S.Ct. at 2503; *Leigh*, 497 F.Supp. at 1351. We therefore find that the Minnesota legislature's use of the term "dignified" in the preamble of the fetal disposal statute does not render the statute unconstitutionally vague.

The district court found, however, that uncertainty remained as to the authorized methods of disposal. For example, the district court could not determine whether "group disposal" was dignified, and therefore found the statute vague.[5] We believe the district court's conclusion misapplies the standards for judging the facial vagueness of a statute. In this context, the court must determine whether the statute can *ever* be applied in a valid manner. *Salerno*, 481 U.S. at 745, 107 S.Ct. at 2100. Whether or not group disposal is authorized by the statute, the district court could have upheld the statute based on valid application in the case of individual cremation or interment. The terms used in the statute are, however, ambiguous in the sense that the permissibility of group disposal is not clear. Although we need not address the group disposal issue to resolve the constitutional issue, we do so in order to resolve this ambiguity.

We note that the statute does not expressly prohibit group disposal. The intent of the statute was to preclude methods of disposal that were not associated with the notion of burial, such as disposal

---

**4.** We cannot accept the state's argument that incineration of the fetal remains is consistent with cremation under the statute. The legislative history does not support this interpretation since incineration was specifically deleted from an earlier version of the statute after a lengthy debate. *See* Senate Floor Debate on S.F. No. 389, 74th Minn.Leg., May 13, 1987. While we can agree that, technically, there is little difference between incineration and cremation since the end result is the reduction of some matter to ashes, *see id.* (statement of Sen. Brandl, App. at 101), the legislature apparently believed that the disposition of the ashes of incineration, in a garbage dump or landfill, was improper compared to the placement of ashes of cremation in a cemetery or other special place. *See id.* (statement of Sen. Chmielewski, App. at 93). Therefore, we do not construe the statute to allow for incineration, meaning the combined burning of abortion and miscarriage remains with hospital waste such as bandages and used needles, as an acceptable method of disposal since that method was specifically rejected by the Minnesota Legislature.

**5.** "Group disposal" refers to the practice of burying or cremating simultaneously the remains of more than one abortion or miscarriage. For example, the record discloses that the St. Paul Ramsey Medical Center disposes of the remains of abortions and miscarriages where development is less than 20 weeks by individually packing and storing the remains, then boxing the remains en masse for cremation by a local cemetery. The cemetery then buries the ashes on its grounds. The cost per box is $50.00. Parents of miscarried fetuses of less than 20 weeks are not consulted on the disposition method, while abortion patients must consent to disposition by St. Paul Ramsey. Affidavit of David M. Fortney, *Planned Parenthood of Minnesota v. State of Minnesota*, Civ. No. 4-87-676.

There is also a debate between the parties as to whether the statute authorizes "commingling" of other body tissues or parts with the fetal remains that are cremated. For example, St. Paul Ramsey Medical Center may box and store amputated limbs for cremation or burial together with the remains of abortions and miscarriages. We believe our discussion of the group disposal issues applies equally to the issue of commingling.

through the sewer system or the indifferent dumping of remains in landfills; however, this intent does not rule out group disposal. *See, e.g.*, Hearings Before the Senate Health & Human Services Committee on S.F. No. 389, 74th Minn.Leg., Apr. 1, 1989 (statement of Sen. Chiemelewski, App. at 124). The legislature acknowledged that several hospitals already disposed of fetal remains by group disposal. *See* Senate Floor Debate on S.F. No. 389, 74th Minn. Leg., May 13, 1987 (Statement of Sen. Chiemelewski) (hospitals store aborted or miscarried fetal remains for disposal on a monthly basis) (App. at 94–95). We therefore believe the statute should be construed to allow group disposal.

■ This interpretation requires consideration of administrative rules that Planned Parenthood argues prohibit group disposal methods, and create additional vagueness problems. The pertinent rule states: "When cremation is selected as a method of disposition, cremation must be accomplished 72 hours from the time of death on all unembalmed bodies. * * * Commingling of cremains shall not be permitted without written permission from next of kin." Minn.R. 4610.2000 (1989).[6]

If group disposal is authorized under the statute, and we have found that it is, Planned Parenthood urges that a conflict exists between this rule and subdivision 6 of the statute, which states that disposition can occur without consultation with the woman. The district court found the ambiguity regarding group disposal compounded by the potential application of this rule. The statute defines "remains of a human fetus" as "the remains of the dead offspring of a human being" which reflects "a stage of development" of "cartilaginous structures, fetal or skeletal parts." Minn. Stat. § 146.1621, subd. 2. Thus, even though the statute strains to equate a human body with the remains of a dead fetus, the two provisions, under common understanding, convey for purposes of the rules involved totally different meanings. The administrative rule on cremation was not adopted to govern the disposal of human fetuses. The state concedes this. We agree with the state that the administrative rule on cremation does not apply to the fetal disposition law.

■ Even if the rule requiring permission for group disposal was intended to apply to fetal disposition, and the state concedes it does not, it is fundamental that the rule cannot take precedence over the explicit language of the statute that no discussion with the woman about the method of disposal is necessary. If the statute allows for group cremation, the permission requirement of the rule cannot be read into the statute where doing so would nullify the express language of the statute. *See, e.g., Minnesota v. Heckler*, 718 F.2d 852, 865 (8th Cir.1983) (agency's interpretation of its regulations "cannot emasculate the plain meaning of the governing statute"); *see also Spears v. Merit Sys. Protection Bd.*, 766 F.2d 520, 523 (Fed.Cir.1985) (agency's regulations must be consistent with statute).[7]

We therefore find the methods of disposal authorized by Minnesota's fetal disposal statute sufficiently clear to avoid vagueness concerns. Further, we find the statute as construed authorizes group disposal methods, but that the state's regulations on group cremation do not govern disposal undertaken in compliance with this statute.

### B. Definition of Fetus

■ Application of the statute is triggered only when the remains of a human

---

**6.** "Cremains" as used in this rule is defined as "the ashes of a dead human body." Minn.R. 4610.2400, subp. 4b.

**7.** The 72 hour disposal requirement of Rule 4610.2000 is also implicated by the group disposal construction of the statute since group disposal implies that hospitals and clinics will be allowed to "stockpile," or store for an extended period of time, the remains of several abortions and miscarriages until cremation is deemed advisable. However, Rule 4610.2000 requires cremation within 72 hours of death for unembalmed bodies. Again, as discussed above, the rule does not apply to aborted fetuses and even if it did it cannot take precedence over the construction we have given the statute, which is consistent with the legislative purpose. *See, e.g., Heckler*, 718 F.2d at 865.

fetus that has reached a certain stage of development are the result of the abortion or miscarriage. Minn.Stat. § 145.1621, subds. 2, 3. The district court was unable to determine whether microscopic slides used to determine whether fetal remains had reached the point of development that the statute applied would have to be disposed of in accordance with the statute. Planned Parenthood argues there is no agreement in the medical community on the meaning of "cartilaginous structures," "fetal parts," or "skeletal parts." Thus, it contends practitioners will be routinely faced with uncertainty over the application of the statute's disposal requirements.

We again believe the district court applied an incorrect standard in striking down the disposal statute based on these concerns. The difficulties identified by the district court in cases of microscopic examinations are present in very few cases. The deposition testimony of pathologists established that only when the attending physician is uncertain whether a pregnancy existed, or the placenta or other material exhibit abnormal characteristics, is the aborted or miscarried material sent to a pathologist for further examination.[8] Generally, the attending physician is able to determine from a gross examination of the fetal remains [9] the existence of a normal pregnancy and "cartilaginous structures, or fetal skeletal parts." [10] When the abortion or miscarriage occurs during the second or third trimester, the fetus has developed to the point that application of the statute can be assumed. Planned Parenthood, however, offers abortion services only during the first trimester of the pregnancy. Admittedly, application of the statute during this period may be difficult to determine. Planned Parenthood's argument, however, hypothesizes a worst case scenario to demonstrate the facial vagueness of the statute. However, this is not the standard for a facial vagueness attack.

> The delicate power of pronouncing a [legislative act] unconstitutional is not to be exercised with reference to hypothetical cases.... [A] limiting construction could be given to the statute by the court responsible for its construction if an application of doubtful constitutionality were ... presented. * * * * The strong presumptive validity that attaches to [a legislative act] has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language.

*United State v. National Dairy Corp.*, 372 U.S. 29, 32, 83 S.Ct. 594, 597, 9 L.Ed.2d 561 (1963) (quoting *United States v. Raines*, 362 U.S. 17, 22, 80 S.Ct. 519, 523, 4 L.Ed.2d 524 (1960)); *see also Salerno*, 481 U.S. at 745, 107 S.Ct. at 2100 (in a facial challenge to a statute, the challenge must establish that under no set of circumstances would the act be valid).

Here, it is obvious that application of the statute can be validly determined in many instances. First, some abortions will be performed at a stage of development where application of the statute is certain. Second, some abortions will be performed where the physician will be able to determine the need for compliance with the statute after performing a gross examination of the specimen, or based on medical knowledge of the characteristics of the fetus at that stage of development.[11] Third,

---

**8.** *See* Depo. of Dr. Thomas Stolee, at 6; Depo. of Dr. Mildred Hanson, at 17–21.

**9.** A gross examination involves simply viewing the specimen without the assistance of a microscopic.

**10.** *See* Depo. of Dr. Mildred Hanson, at 21. The issue of "contaminated" microscopic slides also cannot invalidate the statute. The deposition testimony of pathologists established that it is the rare case where a portion of the fetus is placed on the slide. The pathologist's aim is to view the tissue, not the fetus. Therefore, in the majority of cases, the laboratory will have sufficient guidance from the statute to know that only the actual fetus or developing embryo that has cartilaginous structures or skeletal parts will have to be disposed of in accordance with the statute.

**11.** Planned Parenthood argues that determination of gestational age is too imprecise to assume developmental features of a fetus at a certain gestational age. Again we believe this assumes a worst case scenario. Certainly some

some abortions will be performed where microscopic examination will determine whether compliance with the statute is necessary.[12] Undoubtedly, there will be cases in which the need for compliance with the statute will be difficult to determine. However, these marginal cases cannot defeat the statute. We acknowledge that this statute is not a model of clarity, and for some facilities, may pose compliance difficulties. However, we cannot say that the statute is impermissibly vague in all its applications such that it does not fairly warn of the conduct prohibited.

We therefore find that the statute is not unconstitutionally vague.

## II. SUBSTANTIVE DUE PROCESS

The review of the substantive due process violation found by the district court raises more complex questions, due in no small part to the recent decision by the Supreme Court in *Webster v. Reproductive Health Servs.*, —— U.S. ——, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989); *see also Hodgson v. Minnesota*, —— U.S. ——, 110 S.Ct. 2926, 111 L.Ed.2d 344 (1990). Prior to *Webster*, we believe the statute would have been reviewed under the strict scrutiny standard applied by the district court after it determined that the statute burdened a woman's exercise of the right to choose to have an abortion. *See Planned Parenthood v. Minnesota*, No. 487–676, slip op. at 12 (D.Minn., June 30, 1989). In

*Webster*, however, the Supreme Court appears to have adopted a less rigorous standard of review than the strict scrutiny analysis applied by the district court. *See Webster*, 109 S.Ct. at 3058 ("The Missouri testing requirement here is reasonably designed to ensure that abortions are not performed where the fetus is viable—an end which all concede is legitimate—and that is sufficient to sustain its constitutionality.").[13]

■ We need not decide the extent of the change wrought by *Webster* to the standard of review of abortion regulations, however, since we find that Minnesota's fetal disposal statute does not burden the abortion choice. Regulations that have no significant impact on a woman's exercise of her right to an abortion may be permissible where there exists a legitimate state interest. *Akron*, 462 U.S. at 429, 103 S.Ct. at 2492; *see also Harris v. McRae*, 448 U.S. 297, 315, 100 S.Ct. 2671, 2687, 65 L.Ed.2d 784 (1980); *Maher v. Roe*, 432 U.S. 464, 473–74, 97 S.Ct. 2376, 2382–83, 53 L.Ed.2d 484 (1977). This statute presents just such a regulation. The only conduct regulated is that of the hospital, clinics and medical facilities where abortions are performed, or the physician attending the woman who has had a miscarriage or abortion. The woman need not be told of the disposition means, and indeed, she need not be consulted about the particular provider's choice

patients will present an accurate assessment of the probable date of conception, determined from the date of the last menstrual period, that gestational age and stage of development can be determined with a certain degree of reliability. Also, we note that Planned Parenthood's argument is premised on the notion that it will only comply with the statute when necessary. There is nothing in the statute, however, that prohibits Planned Parenthood from following the disposal requirements even in those cases where it may not be necessary.

12. This conclusion necessarily entails additional expense. The burden, if any, that this expense would create is discussed *infra* with respect to the substantive due process argument.

13. This change in the level of scrutiny (if any) results from the Court's apparent rejection of the trimester framework of *Roe v. Wade*, 410

U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). *See Webster*, 109 S.Ct. at 3056–58. The Court's discussion of the State's interests in *Webster* suggests this lower level of scrutiny applies throughout the pregnancy. *See id.* at 3057 ("[W]e do not see why the State's interest in protecting potential human life should come into existence only at the point of viability, and that there should therefore be a rigid line allowing state regulation after viability but prohibiting it before viability. * * * We are satisfied that the requirement of these tests permissibly furthers the State's interest in protecting potential human life, and we therefore [find it constitutional].");* see also Hodgson*, 110 S.Ct. at 2950 (the statute "cannot be sustained if the obstacles it imposes are not reasonably related to legitimate state interests."); Dellinger & Sperling, *Abortion and the Supreme Court: The Retreat from Roe v. Wade*, 138 U.Pa.L.Rev. 83, 84 (1989).

for disposition.[14] Rather than regulating abortion, this statute acknowledges the existence of abortion and regulates an issue related to abortion. While the statute admittedly touches on abortion, we cannot say it interferes with or burdens a woman's right to choose to have an abortion.

Planned Parenthood argues, however, that the increased cost resulting from expensive methods of disposition (which will be passed along to the woman obtaining the abortion), as well as the psychological trauma created by the statute [15] are severe burdens on the right to an abortion. We do not agree with Planned Parenthood's assessment of the burden created by the increased costs, if any. The statute as construed allows for group disposition. Therefore, the cost of disposition is less significant than Planned Parenthood suggests. Hospitals currently using group disposition methods estimate their monthly cost at approximately $40–60. Even if a portion of that cost is passed along to the woman obtaining the abortion, it will only be a small percentage of the total cost. The Supreme Court has indicated that costs of up to $19.40 per patient do not create a burden sufficient to strike down an abortion regulation. *See Planned Parenthood Ass'n of Kansas City, Mo., Inc. v. Ashcroft*, 462 U.S. 476, 489–90, 103 S.Ct. 2517, 2524–25, 76 L.Ed.2d 733 (1983). We believe the cost resulting from mandated disposal methods is permissible under the reasoning of *Ashcroft*.[16]

We also do not accept Planned Parenthood's argument that the statute creates an impermissible psychological burden by equating abortion with murder. Planned Parenthood argues that the state's purpose, taking fetuses out of the sewer system, can only succeed if the woman obtaining the abortion is aware of the statute's requirements. However, this argument seems to overstate the case. Abortion patients were not told of disposal methods prior to this statute. We discern no reason why the patient needs to be informed of the disposal choices now that the certain methods have been mandated. The choice of disposal is left to the physician or facility providing the abortion. There is no need for the patient's input, other than in the case where the patient requests specific information. Planned Parenthood's argument that the statute represents the state's conclusion that fetal remains are the equivalent of human remains is also unavailing. We cannot agree that the Minnesota legislature intended to convey meaning beyond common acceptance of common terms. However, even assuming this is the true purpose, we do not find it to be an invalid purpose. A state may make a value judgment favoring childbirth over abortion. *See Webster*, 109 S.Ct. at 3050.

The district court further concluded that, even if the disposal statute did not impinge on a fundamental right, it was not rationally related to any legitimate governmental interest, finding the statute both

---

**14.** The record indicates that some abortion providers already obtain the woman's consent to allow the facility to dispose of the remains in the manner it deems appropriate. *See supra* note 5. What the provider may do voluntarily and what the law requires are two different concerns.

**15.** Planned Parenthood finds psychological trauma from the state's attempt to equate abortion with murder by raising the aborted fetus to the level of a dead human requiring a decent burial. *Cf. Margaret S. v. Treen*, 597 F.Supp. 636, 668–71 (E.D.La.1984), *aff'd*, 794 F.2d 994 (5th Cir. 1986).

**16.** Planned Parenthood currently uses a pathologic disposal system which eliminates the aborted material into the sanitary sewer system.

Planned Parenthood, and some other facilities, will admittedly have to adopt a different disposal method than the one currently in use. However, it has offered no evidence that it would not be able to obtain group disposal rates in the range that some hospitals currently pay. We recognize that, given the volume of Planned Parenthood's services, it may require disposal services on a more frequent basis than some hospitals which do not have as high a number of abortion or miscarriage patients. This increased cost will, however, be passed along to a higher number of patients, thus, the cost difference per patient may not be significant. Further, without specifics as to the cost, we cannot say that the cost of disposal will be an unconstitutional burden on Planned Parenthood's clients.

underinclusive and overinclusive.[17] Planned Parenthood concedes the state has a legitimate interest in protecting public sensibilities. Where a challenger attacks the classifications drawn by a state, the classification can be upheld if the evidence before the legislature reasonably supports the classification. *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464, 101 S.Ct. 715, 723, 66 L.Ed.2d 659 (1981). Further, a legislature must have the latitude to "establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill." *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982).

We find the classifications created by the Minnesota legislature here fall within the permissible boundaries recognized by the *Clover Leaf Creamery* and *Plyler* courts. Although abortions and miscarriages occurring at home are not regulated, the state of Minnesota has chosen to draw the line of regulation at hospitals and clinics. We cannot say, given the privacy concerns implicit in activity in one's home, that the state impermissibly drew its boundaries. *See Plyler*, 457 U.S. at 217, 102 S.Ct. at 2395; *see also Clover Leaf Creamery*, 449 U.S. at 466, 101 S.Ct. at 725 (legislature need not strike at all evils at one time).

 We also cannot say the classification is overinclusive. The Minnesota's legislature's overriding concern was protection of the public's sensibilities by ensuring that fetal remains be disposed of in a specified manner. Achievement of this purpose logically requires that the regulation sweep within its scope both voluntary abortions and spontaneous miscarriages since both events result in fetal remains requiring some type of disposal. The Minnesota legislature could reasonably believe that regulating both abortions and miscarriages fulfills this purpose. We cannot disagree

with this judgment and we therefore find that the fetal disposal statute is reasonably related to the state's legitimate interests.

## CONCLUSION

We find the statute facially valid as construed, and that it does not interfere with a woman's right to obtain an abortion. We therefore reverse the district court and direct entry of judgment for the State.

protecting the mental health of mothers suffering miscarriages by assuring that a proper burial was undertaken, then mothers who voluntarily abort should not be included in this group.

---

**17.** The statute was underinclusive, in the district court's opinion, because it failed to cover abortions or miscarriages occurring outside hospitals or clinics. It was likewise overinclusive, because if the state's asserted interest was in